## INTERSTATE BLDG. & LOAN CO. et al. v. OKLAHOMA CITY et al.

No. 9824—Opinion Filed March 8, 1921.

Rehearing Denied Jan. 10, 1922.

(Syllabus.)

1. Appeal and Error — Review of Equity Case—Findings—Evidence.

In a case purely of equitable cognizance the findings of fact by the trial court will not be disturbed by this court, unless the same are clearly against the weight of the evidence.

2. Equity—Jurisdiction—Complete Relief.

A court of equity which has obtained jurisdiction of the controversy on any ground or for any purpose will retain such jurisdiction for the purpose of administering complete relief and doing entire justice with respect to the subject-matter, and avoid multiplicity of suits.

3. Municipal Corporations—Paving—Acceptance of Work by City Authorities—Conclusiveness.

Where, in compliance with the statute, the city commissioners award a contract for paving streets and the commissioners, on a hearing regularly had for that purpose, adjudge acceptance of the work over the protest of the abutting property owners, where there is nothing more than a dispute as to whether the work has been reasonably well done, such acceptance, in the absence of fraud, is conclusive and binding upon the property owners.

4. Same—Assessments for Paving—Action for Injunction—Judgment.

Record examined, and held, that the judgment of the trial court awards the parties that relief that each respectively is, in equity and good conscience, entitled to.

Error from District Court, Oklahoma County; Geo. W. Clark, Judge.

Action by the Interstate Building & Loan Company and others against the City of Oklahoma City and others to enjoin assessments for certain paving. Judgment for defendants, and plaintiffs bring error. Affirmed.

G. A. Paul, for plaintiffs in error.

J. S. Ross, A. F. Decker, B. D. Shears, and Ames, Chambers, Lowe & Richardson, for defendants in error.

JOHNSON, J. The plaintiffs in error, as plaintiffs below, filed their petition in the district court of Oklahoma county, on the 3rd day of October, 1917, which stated, in substance, that they were the owners of property liable for assessments on account of the improvement of what is known as Harndale addition, in Oklahoma City, lying between Classen boulevard on the west and Shartel avenue and Thirteenth street on the south and Sixteenth street on the north; that the city of Oklahoma City, acting under the provisions of the paving law, directed the improvement of these streets, adopting the usual and customary proceedings authorized by law to make such improvements and eventually to levy assessments to pay the cost thereof.

The petition recites that on the 23rd day of November, 1915, the mayor and commissioners of Oklahoma City authorized and directed the city engineer to prepare complete and accurate plans, specifications, and estimates for this paving, and approved the same on the 30th day of November, 1915, and thereafter passed a resolution deeming it necessary to pave the streets embraced in this district. On the 8th day of December, 1915, the mayor and commissioners adopted what was known as "national paving specifications" as a part of the general specifications of the city for asphalt pavement. This resolution adopting the national paving specifications was not embraced within the engineer's specifications as originally adopted on November 30th. Thereafter the customary proceedings were had leading up to the execution of a contract with the National Paving Company, by the terms of which it was to construct the improvement in strict accordance with the plans and specifications therefor, and in a good and workmanlike manner, for all of which the contractor, National Paving Company, executed contractor's bond, and the customary statutory bond, and the maintenance bond. Thereafter, on the 19th day of September, 1916, a resolution was adopted appointing appraisers to apportion and appraise the benefits arising from said work of construction; and on the 27th day of February, 1917, the mayor and commissioners passed a resolution fixing a day for hearing of protest and setting the time for March 27, 1917.

The petition then recites that the report of the board of appraisers omitted an appraisement and assessment against five parks in this addition, the property of the city of Oklahoma City, and spread the entire assessment over the property of the plaintiffs in error herein. As required by law, the plaintiffs in error appeared at the meeting of the commissioners as a reviewing board, and filed a written protest against the assessments so levied, expressly, however, reserving in said protest the right to be heard further upon the question of the construction of the work in accordance with the specifications. The meeting of the commissioners as a reviewing board on the 27th day of March, 1917, adjourned to April 10, 1917. The board did not meet on April 10, 1917, as a reviewing board, but did meet on April 27, 1917, as such reviewing board, and accepted the report of the appraisers and denied the protest of the plaintiffs in error. That on June 19, 1917, the city engineer was instructed to report at the next regular meeting whether or not the paving was laid according to the plans and specifications, and whether or not

the streets were in safe condition for travel. On July 3, 1917, the engineer and city chemist reported that the required amount of asphalt was used in the paving mix; that thereupon by resolution the commissioners accepted the paving. And again, on August 21, 1917, the commissioners accepted the paving.

The petition sets out two causes for relief: First, that the assessment levied by the board of appraisers, having omitted city property, was not a correct assessment; and, second, that the work of construction from its inception to its conclusion was not in accordance with the plans and specifications, and the acceptance thereof was over the protest of the property owners, plaintiffs in error herein, and such acceptance was arbitrary, entirely in disregard of the rights of the property owners—and prays for an injunction to prevent the levy and collection of assessments against the property of the plaintiffs in error, except for such assessments as would embrace the work which was actually in accordance with the plans and specifications, namely, grading, curbing, and drainage, in an amount not to exceed $12,000, to be apportioned to the property of the plaintiffs in error and to the city by reason of its ownership of the parks.

The district court granted a temporary restraining order in said cause. Thereafter, on the 6th day of December, 1917, the American National Bank of Oklahoma City, having had leave to interplead, filed its answer, alleging that the National Paving Company complied with the terms of the contract for the construction of this improvement; and also alleging an interest which it had on account of an assignment of certain bonds thereafter to be issued. The city of Oklahoma City also filed its answer, alleging that it was not liable for the assessments against the parks; and, in addition thereto, that the work was constructed in accordance with the plans and specifications. The National Paving Company adopted the answer of the defendant city of Oklahoma City as its answer. The plaintiffs below replied by general denial, and on the 7th day of December, 1917, upon the issues joined, the case was tried upon its merits and upon final hearing to the court.

After hearing all the testimony in the case, the trial court rendered judgment, in which judgment, at the request of the parties, he made certain findings of fact and conclusions of law, which were as follows:

"This cause came regularly on for trial on the 8th day of December, 1917, and thereupon by agreement of counsel in open court, said

cause was submitted to the court for trial and for a final hearing upon the merits of said cause.

"The plaintiffs appeared 'in person and by their attorney, G. A. Paul; the defendant, the city of Oklahoma, appeared by its attorney, Byron D. Shear; the National Paving Company appeared by its attorney, A. D. Decker, the American National Bank of Oklahoma City, Oklahoma, appeared by its attorneys, Ames, Chambers, Lowe & Richardson, and the American Indemnity Company appeared by J. S. Ross, its attorney. Thereupon the plaintiff and the defendants and the interpleaders, respectively, introduced their evidence upon the issues joined in said cause and rested their case. That the taking of evidence and the trial of said cause was continued from day to day from December 8, 1917, up to and including the 17th day of December, 1917, when the trial of said cause was finally concluded, and the same was submitted to the court for judgment, and the court, after hearing the evidence and being fully advised in the premises, finds that on January 27, 1916, the city of Oklahoma City, Oklahoma, entered into a contract with the National Paving Company, for the paving of the streets and boulevards set forth in plaintiffs' petition in the city of Oklahoma City, Oklahoma, and described as follows, to wit: Classen boulevard from the intersection of Thirteenth street and Shartel avenue to the west line of Classen W. H. P. addition; Harnplace from the west line of Classen W. H. P. addition to the intersection of Sixteenth street and Western avenue, Harnplace from the east curb line of Western avenue to the south drive of Harnplace from the west line of Shartel avenue to the north drive of Harnplace.

"The court finds that all of the proceedings of the city commissioners, up to and including the letting of the contract to pave the streets and boulevards in Harnplace as above described to the National Paving Company, were regular and in accordance with law; that the National Paving Company after the execution of said contract on January 27, 1916, entered upon the work of paving said streets and boulevards and during the latter part of January, or the first part of February, 1917, completed said paving and improvements.

"That .nereafter the city commissioners duly appointed appraisers to apportion and approve the benefits of said paving to the abutting owners, and said appraisers duly filed their report of said appraisement and apportionment with said city commissioners. That thereafter said city commissioners, in accordance with law, gave the property owners notice of the hearing of said report, and on the 27th day of March, 1917, the plaintiffs herein duly filed a protest against the approval of said appraisers' report by said city commissioners. That the protest of said plaintiffs was to the effect that said appraisers

had not assessed against various tracts of land designated as parks in the dedication and plat of said addition any sums of money whatever for the benefits received from such paving, but it assessed the entire costs of said paving and improvements against the other abutting property in said addition, thereby imposing upon the property of these plaintiffs an unjust and unlawful burden and assessment. That said protest was duly presented to said city commissioners and said commissioners overruled the protest of said plaintiffs and approved the assessments of said appraisers.

"The court finds that certain tracts of land designated as parks in the dedication and plat of said addition were omitted by the appraisers in the assessment of the paving benefits, and that such tracts of land were within the paving district so created and were liable for paving benefits.

"The court further finds that on August 31, 1917, the city commissioners, after overruling the protest of said plaintiffs, passed an ordinance apportioning the benefits of said pavement and improvements, and assessing the same to the abutting property owners, within the district created, the same being the plaintiffs in this case, and in said assessing ordinance omitted to assess any benefits to said tracts of land designated in said dedication and plat as parks.

"The court further finds that at the time said assessing ordinance was passed there were but three city commissioners present and voting upon the same, and that the vote upon the passage of said ordinance was two votes for the passage of said ordinance and one vote against the passage of said ordinance.

"That under the charter of said city there were five city commissioners and the said city charter provided that there must be a vote of a majority of the five commissioners before any ordinance can be legally and validly passed, that three commissioners must vote for the passage of an ordinance before the same can become effective and valid.

"The court further finds that after said pavement had been completed the said plaintiffs, upon several occasions, at meetings of said city commissioners, verbally protested against the acceptance of said paving by said city commissioners by reason of the fact that the said pavement had not been constructed in accordance with the plans and specifications and the contract entered into between the paving company and the city commissioners and fully discussed by the contractors and their representatives and the plaintiffs and their representatives, and the said city commissioners were fully advised of all complaints made against the acceptance of said paving.

"That said city commissioners on several occasions inspected said pavement and required a report upon said pavement by the

city engineer and his assistant, the city chemist. That the city engineer reported to said city commissioners that the improvements had been constructed in accordance with the plans and specifications, and the said city chemist reported an analysis he had made of said pavement, showing the average amount of asphalt used therein. That said city commissioners, after hearing the report of said city engineer and chemist, did on July —, 1917, accept said pavement as being in accordance with the plans and specifications, and the contract between said city and said National Paving Company.

"The court further finds that the tracts of land designated as parks in the dedication of the plat of said addition should be assessed for the payment of said pavement according to the benefits received.

"The court further finds that the assessing ordinance passed by the city commissioners on the 31st day of August, 1917, is invalid, in that it did not receive a majority of the vote of said city commissioners.

"The court further finds that the acceptance of said pavement and improvements by the city commissioners is binding and conclusive upon the court in this proceeding and that in said acceptance no fraud was perpetrated by any person or persons and that upon the enactment of a legal ordinance assessing benefits, the contractor or his assigns will be entitled to have the bonds of said city in the sum of $37,823.98, issued and delivered to them.

"The court further finds that the American National Bank has a valid assignment of said bonds from the National Paving Company when the same shall be issued, and when issued said bonds should be delivered to said American National Bank for money so advanced by it to said National Paving Company.

"The court further finds that in the trial of this cause it was agreed in open court that this court should pass upon the following propositions: (1) Is the assessing ordinance passed by the city commissioners a valid ordinance, the same being voted on by only two members of the city commissioners present? (2) Are the tracts of land designated as parks in the dedication and plat of said addition subject to assessment for said improvements? (3) Are the plaintiffs entitled to an injunction against the defendants upon the allegations of the petition, and the evidence offered in support thereof, to the effect that said pavement was not constructed in accordance with the plans and specifications?

"It is therefore ordered, adjudged and decreed by the court as follows:

"(1) That the assessing ordinance passed by the city commissioners is invalid and that the city commissioners are hereby enjoined from proceeding towards the enforcement of the same.

"(2) That the tracts of land designated as parks in the dedication and plat of said addition are subject to assessment for the benefits received from said improvement, and the assessing ordinance of the city commissioners in omitting to assess benefits for said improvements to such tracts of land is invalid and said commissioners are hereby enjoined from enforcing the same, and are hereby ordered and directed to assess all of said property abutting upon said improvements, including said parks, in accordance with law, for the benefits received.

"(3) It is further ordered and adjudged by the court that the action of the city commissioners in accepting said improvements as being in compliance with the plans and specifications is binding and conclusive upon the court in this proceeding, and that said plaintiffs are not entitled to the relief prayed for in their petition, upon the allegations that the said contractor, National Paving Company, did not construct said pavement and improvements in accordance with the contract and the plans and specifications by reason of the aforesaid acceptance by the city commissioners.

"And it is hereby ordered and adjudged that when said city commissioners shall have assessed all of the property abutting upon the said improvements and including said tracts of land designated as parks in the dedication and plat of said addition, for costs of said improvements in accordance with the benefits received as provided by law, and for the payment of the full contract price thereof, and said city commissioners shall issue its bonds in accordance with law and the said contract between said city and said paving company in the full amount of the contract price, it shall deliver the same to the said American National Bank as assignee of said paving company.

"It is further adjudged that the costs of this action be taxed equally one-half to the plaintiffs and one-half to the defendants, and interpleader.

"To all of which the plaintiffs and defendants duly excepted and said exceptions were by the court allowed."

The plaintiffs filed a timely motion for a new trial, which was as follows:

"Come now the plaintiffs in the above entitled cause and move the court to set aside the decision of the court upon the legality of the acceptance of the paving as being conclusive and binding upon the plaintiffs herein, and to grant a new trial hereupon upon that question, and for cause thereof says that the decision of the court is contrary to law" —which was by the court overruled and exceptions saved. and thereafter the plaintiffs regularly commenced this proceeding in error, their assignments of error being:

(1) "That said court erred in overruling

the petition of the plaintiffs in error for new
trial;

(2) "That the court erred in not render-
ing judgment for the plaintiffs in error on
the special findings of the court;

(3) "That the court erred in rendering
judgment in favor of the defendants in er-
ror as against the plaintiffs in error.

(4) "That the court erred in refusing to
grant the plaintiffs in error a perpetual in-
junction as prayed for in the petition;

(5) "That the court erred in holding that
as a matter of law that the decision of the
board of commissioners in the acceptance of
the paving was final and conclusive on the
court;

(6) "That the decision of the court was
not sustained by the law; and

(7) "That the decision of the court was
not sustained by the evidence."

Concerning which counsel say in their
brief:

"While there are several assignments of
error in the petition in error, yet for the
purpose of this argument it will be unneces-
sary to take up each assignment of error, but
to argue them as a whole for the reason that
the decision of the court is contrary to law."

The record presents this situation: The
plaintiffs alone have appealed; none of the
defendants have appealed, but all ask that
the judgment of the trial court be affirmed.

As we have seen, the plaintiffs' petition
sets out two causes of action for relief: 1st.
That the assessment levied by the board of
appraisers, having omitted city property, was
not a correct assessment. The judgment of
the trial court sustains this contention of the
plaintiffs upon two grounds: (1) The assess-
ing ordinance passed by the city commis-
sioners is invalid because the same did not
receive a majority vote of the five commis-
sioners; (2) that the tracts of land desig-
nated as parks in the dedication and the plat
of said addition were subject to assessment
for the benefits received from said improve-
ments, and that the assessing ordinance in
omitting to assess benefits for said improve-
ments to said tracts of land is invalid—and
said judgment enjoins the city commissioners
from proceeding to enforce such assessing
ordinance, and directs the commissioners to
assess the said property abutting on said im-
provements, including said parks, in accord-
ance with law for the benefit received.

This part of the judgment of the trial court
is in favor of the plaintiffs and in accord-
ance with the relief asked by them in their
first cause of action, except the plaintiffs
concede that the cost of the improvements
to the extent of $12,000, for grading, curb-
ing and drainage, is valid, and should be
apportioned to the property of the plaintiffs

in error and to the city by reason of its
ownership of the parks.

The plaintiffs' second cause of action al-
leged that the work of construction of the
paving, from its inception to its conclusion,
was not in accordance with plans and specifi-
cations, and the acceptance thereof was over
the protest of the plaintiffs, was arbitrary
and in disregard of their rights, and they
prayed for an injunction to prevent the levy
and collection of assessments against their
property, except for the grading, curbing,
and drainage, as hereinbefore stated.

The judgment of the trial court refused the
injunctive relief, and ordered that when said
city commissioners shall have assessed all
of the property abutting upon said improve-
ments, and including said tracts of land
designated as parks, for the cost of the said
improvements in accordance with the bene-
fits received as provided by law, and for the
payment of the full contract price thereof,
and in accordance with the contract between
the city and said paving company, they shall
deliver the same to the American National
Bank, assignee of said paving company; and
it is from this part of the judgment of the
trial court denying injunctive relief that the
plaintiffs have appealed, concerning which
they say in their brief:

"We recognize that there are certain limi-
tations imposed upon the courts in their con-
trol of the acts of commissioners and boards
charged by law with the performance of cer-
tain municipal and public duties, and we
recognize the rule announced by many courts
that in the absence of fraud, actual or con-
structive, the courts will not interfere with
the judicial determination of commissioners
in the acceptance of a work of public im-
provement where there is an honest belief
based upon substantial compliance with the
terms of the contract that such contract has
been performed and acceptance results.
Authorities are numerous upon that proposi-
tion, and it was based upon the theory that
no actual fraud appears in the trial of this
case upon which acceptance was brought
about, that the court below fell into the er-
ror of denying to the plaintiffs in error the
injunction prayed for in this case. It was
not, and it is not now, our intention to claim
that actual fraud exists in the acceptance of
this work, but we do claim that there exists
a state of facts here that warrants the inter-
vention of a court of equity to prevent the
city from charging the property owners in
this case with the cost of this so-called im-
provement that will forever be a detriment
rather than a benefit to the property in-
volved. * * *

"We respectfully submit that the record in
this case shows that an injustice has been
perpetrated by the city in charging the prop-
erty owners with the cost for constructing
this worthless pavement, which constitutes a

detriment rather than a benefit, and that the court below in the conclusion which it reaches with reference to the law on the subject of acceptance was in error; and after a careful consideration of the law of this case when applied to the facts as disclosed by the record, we urge that upon the principles of equity the property owner should not be required to pay for this so-called improvement; and respectfully submit that this cause should be reversed with directions to perpetually enjoin the enforcement of the assessments for the cost of the construction of such improvement."

The gist of the contention of counsel for plaintiffs is that the trial court erred in refusing an injunction, notwithstanding the action of the city commissioners in accepting the work was free from fraud. This contention is quite clearly expressed in the foregoing contention wherein it is said:

"We recognize that there are certain limitations imposed upon the courts in their control of the acts of commissioners and boards charged by law with the performance of certain municipal and public duties, and we recognize the rule announced by many courts that in the absence of fraud, actual or constructive, the courts will not interfere with the judicial determination of commissioners in the acceptance of work of public improvement where there is an honest belief based upon substantial compliance with the terms of the contract that such contract has been performed and acceptance results. Authorities are numerous upon that proposition, and it was based upon the theory that no actual fraud appears in trial of this case upon which acceptance was brought about, that the court below fell into the error of denying to the plaintiffs in error the injunction prayed for in this case. It was not, and it is not now, our intention to claim that actual fraud exists in the acceptance of this work, but we do claim that there exists a state of facts here that warrants the intervention of a court of equity to prevent the city from charging the property owners in this case with the cost of this so-called improvement that will forever be a detriment rather than a benefit to the property involved."

The trial court made specific findings that the commissioners accepted the improvement honestly believing at the time that the same was in substantial compliance with the contract, and concerning that matter, after summing up the evidence, the trial court, in a specific finding upon the question. said:

"Where there was a disputed question of fact, relative to the construction of the pavement, relative to the compliance or noncompliance with specifications and a hearing is had and the commissioners say: 'We believed all the time that it was a physical impossibility to get a good pavement on that formula. but you insisted that it must be put down in the face of our individual beliefs that you

would regret it and that it would not be a good work, we believe from the investigation that we have made, and we have been out there to look at it, and we see here and there are cracks in here, we will say'—I don't know whether there were or not when they were out there,—'But that's a very common occurrence in driving over town, to see these bad places on any other kind of pavement, and there isn't anything in the specifications that says that cracks shall not appear except that it's to be a compact mass; you have got a remedy if that isn't a good pavement; if, upon judicial inquiry, it should be ascertained that the specifications had not been followed and the only way on earth that we can tell now whether they have been followed is by inspection of it, by looking at it, by inquiring about what has been done, by having our chemist investigate to see whether sufficient asphaltum is in there, and from this inquiry we have reached the conclusion that the specifications have been complied with substantially; of course you have a poor pavement in some portions, than you had before, but that was the result of your own agreement that that sort of thing might be put down; if it would get a good pavement there, why that's all right, and that was done; now we have reached the conclusion that you have got just as good pavement there as you could get from these specifications. * * *'

"Take this evidence, these experts; take Doctor DeBarr's testimony, take the samples that have been produced here,—I don't think the dust that was produced here by Doctor DeBarr, after his chemical analysis, is of that dust-like fineness that the Kansas City or that the known sample produced; I don't think they had as good dust as they got at Kansas City, because if you take it up between your thumb and finger it's gritty and while it looks fine, the grit is there that is absent from the other sample, but that was not known at the time this work was approved. An investigation was made,—I believe that the commissioners honestly believed that they got just as good a job there as they could get from that formula, but I don't believe they have got as good a job as they would have if they had had an inspector out there with a chemist to examine it."

As hereinbefore stated, the trial court further found, as set forth in the journal entry of the judgment:

"That said city commissioners on several occasions inspected said pavement and required a report upon said pavement by the city engineer and his assistant, and the city chemist. That the city engineer reported to said city commissioners that the improvement had been constructed in accordance with the plans and specifications and the said city chemist reported an analysis he had made of said pavement, showing the average amount of asphalt used therein. That said city commissioners, after hearing the report of said city engineer and chemist, did on July —. 1917, accept said pave-

ment as being in accordance with the plans and specifications and the contract between said city and said National Paving Company. * * * The court further finds that the acceptance of said pavement and improvements by the city commissioners is binding and conclusive upon the court in this proceeding and that in said acceptance, no fraud was perpetrated by any person or persons and that upon the enactment of a legal ordinance assessing benefits as herein directed and a proper apportionment of said benefits the contractor or his assigns will be entitled to have the bonds of said city in the sum of $37,823.98 issued and delivered to them."

From the above recital of the judgment of the court, we must necessarily conclude that the commissioners acted honestly and carefully in the acceptance of this work. They made personal inspection of the work; they heard the complaints of property owners fully, and the claims of the paving company; they required their engineer and assistant engineer and city chemist to investigate and report to them; and, after all this was done, the commissioners accepted the pavement as complying with the plans and specifications. These are the findings of the court as set forth in the judgment, and upon these findings the court held that the acceptance of the paving was binding and conclusive, and that there was no fraud. The action of the commissioners was not arbitrary.

Our statute provides for no appeal from the decision of the commissioners upon the acceptance or approval of the paving, but defines the bounds and authorizes and gives the city commissioners full control of the making of the contract and of the carrying out of its terms.

Under the great weight of authority, the acceptance of the work by the city commissioners is final and conclusive, in the absence of fraud. The text-book principally cited in the decisions is Elliott on Roads and Streets. In the 3rd Edition, vol. 2, sec. 728, the author says:

"By some of the courts it is held that the acceptance of the work by the highway officers is only prima facie evidence that it has been done according to contract, and this is obviously correct in cases where the statute gives the right of appeal and, either expressly or by fair implication, authorizes the trial of all questions on appeal, or expressly enumerates what shall not be tried, and does not include in the enumeration the question whether the work was or was not performed as the contract requires. According to the great weight of authority the rule, under most of the statutes and in the absence of a statute granting a right to contest the question whether the work has been done in conformity to the terms of the contract, is that the acceptance by the highway authorities is conclusive upon the property owners. It is not without dissent that this rule has found general favor, and, too, it seems that the broad ground which some of the cases take is untenable. It may be expedient and just to adjudge acceptance conclusive where there is nothing more than a dispute as to whether the work has been reasonably well done, but it can be neither expedient nor just to hold the acceptance conclusive in cases where it appears that the work is of an entirely different kind from that required by the contract or is totally worthless."

Cooley on Taxation (3rd Ed.) vol. 2, p. 1280, says:

"It is in general no defense to an assessment that the contract for the work has not been performed according to its terms. If the proper authorities have passed upon the question and accepted the work as satisfactory, the acceptance must be conclusive; there cannot and ought not to be an appeal from them to court or jury. * * *

"But this doctrine must be confined within its proper limits; it cannot be extended to cover a case in which the authorities, after contracting for one thing, have seen fit to accept something different in its place; for if this might be done, all statutory restraints upon the action of local authorities in these cases would be of no more force than they should see fit to allow them. And no doubt if it were claimed that by fraud the cost of the work was purposely made excessive, the fact might be inquired into and redress obtained, either in a direct proceeding for the purpose, or on appeal, if a competent appellate tribunal was provided."

In Page & Jones on Taxation by Assessment, vol. 1, sec. 532, it is stated:

"In accordance with the theory already given as to the effect of the acceptance of work by the city or other public corporation, it has been said that if the public corporation has accepted the work as being in proper performance of the contract under which the improvement has been constructed, the question of actual performance as a matter of fact is immaterial, if it cannot be shown that in accepting the work the public officials were guilty of fraud or bad faith. The suggestion that fraud may invalidate the action of the city officials in accepting the performance of the contract is ordinarily made in cases where defective performance is claimed, but there is no showing of fraud or bad faith."

In section 533, the author says:

"It is held in some jurisdictions that if an improvement has been constructed to the satisfaction of the public authorities and has been accepted by them, defects in perform-

ance are no defense to the assessment unless the improvement is a different one from that which has been contracted for. If the improvement contracted for has been constructed, but the performance is defective, the assessment is under this theory not rendered invalid by reason of such defect."

In case of Duniway et al. v. City of Portland et al. (Ore.) 81 Pac. 945, the third paragraph of the syllabus reads as follows:

"In the absence of fraud, the acceptance by the board of public works of a local improvement is conclusive on collateral attack of the improvement assessment, wherein it is sought to question the manner in which the work was done."

In the opinion, p. 948, the court says:

"Plaintiffs filed written objections, as indicated by the complaint; but it is not clear from their reading whether they were intended to call in question the manner in which the work was done, or whether in accordance with the specifications. But, however this may be, the council, as we shall see presently, presumably passed upon the objections, and the plaintiffs are now precluded from again raising the issue in this collateral way, except it be shown that the council has itself proceeded fraudulently" (citing a number of cases).

In the case of State ex rel. Murphy v. Coleman, Mayor, et al. (Wash.) 127 Pac. 568, the court says:

"It was the duty of the engineer as the representative of the city to see that the work was properly done as it progressed. If he did not do so and made no complaints to the contractor, or demands upon him for changes, he failed to perform his duty as the authorized representative of the city, and, in the absence of any showing of fraud, collusion, or intentional wrongdoing upon the part of the contractor, the city should be bound by his acts. In the recent case of Morehouse v. Edmunds (Wash.) 126 Pac. 419, this court, citing numerous authorities, said: 'It is well settled that, in the absence of fraud, an acceptance of a public improvement by the governing body or by the party authorized by the charter, ordinance, or contract to accept it is conclusive upon both parties.'"

In the case of City of North Yakima v. Scudder et ux. (Wash.) 82 Pac. 1022, the sixth paragraph of the syllabus reads:

"In the absence of collusion or fraud, the letting of a contract for street improvements is within the discretion of the city council, and is conclusive on property owners assessed for the improvements."

The trial court consumed seven or eight days in the trial of this cause; a vast amount of testimony was taken; that of the property owners, the paving company, the city officials, paving experts, and employes employed upon the work; and at the conclusion of the testimony the court, upon the request of counsel, personally inspected the improvements, and filed separate findings of fact and conclusions of law, only a portion of which was contained in the journal entry of the judgment, and from a summary of the evidence embraced in said findings, the court said:

"If it was up to me to decide these questions, instead of having been up to the commissioners in the first place, I would announce a decision that would meet my approval most heartily. Here was an addition, admitted to be the best location at the time it was platted, that there was in the city; it was laid out in a way that contemplated beautifying the boulevards, the parks which had been accepted by the city under the dedication and they had accepted it in that they had gone to work to do the very things which they, under the deed of dedication, were required to do if they did accept the benefits of the deed and improved. It had not been paved, and an experimental pavement was suggested to the owners to be put down in this addition, one which the court believes they had full faith and confidence in. They believed that doing away with the concrete base would not lessen the durability of the pavement; that it would be just as desirable, to say the least; and do away with a considerable item of expense in its construction; the people who were doing this were home people, in the paving business, and made this selection apparently because of the fact that they expected a great deal of advertising on that. They courted investigation; one of the proprietors of this addition, Mr. Classen, went to Independence, Missouri, and inspected paving there that had been constructed along these lines, except that it had a concrete base; one of the commissioners, the one who had immediate charge of the streets, went there with one of the officers of the paving company and examined paving that was then being done without the concrete base, as well as one that had been constructed with it. I think that he was fairly well satisfied with the work; he was there as the guest of the paving company. The petition for the paving was finally presented to the commissioners, signed by the property owners, in which they asked for the installation of this particular paving. Generally, the commissioners were opposed to considering it; the city engineer was opposed to it; there didn't any of them apparently believe, unless it was Mr. Blackwelder, that it would prove a success without a concrete base, but they finally accepted it and ordered the work done, simply because the owners of the property were insistent on it. The city engineer, I think, he asked—I think it was at this time—that his protest be entered of record, which was done. A maintenance bond was required of 100 per cent. for the protection of the city and the property owners, along with the other bond of 20 per cent. referred to. The work com-

menced. Doctor Enochs was there on the ground to see what was being done; I think it was the second day of the laying of the first coat—at any rate, it was early in the proceedings—he observed that the mixture that was being put down was of a different color or of a different shade from that which had first been put down, and called the attention of Mr. Snodgrass, who was superintending the construction of the paving on the part of the company, to this color, and expressed the belief that the work was not being done just right, that the mixture was not right, or that something was wrong; and Mr. Snodgrass said it was impossible to make a mistake in this matter; because the mixture was being regulated by machinery that had been gauged a certain way and that it could not be wrong. I am not sure whether there was anything else attracted the doctor's attention than the color or not, but he expressed the theory that it was not right. He went to Mr. Welty, the president of the company, and talked to him the same way; Mr. Welty told him that there could not be a mistake about it, because in the very nature of things it had to turn out the product that that machine, set as it was, would produce. He went to Mr. Burk, who was at one time city engineer of Oklahoma City, for a number of years, and who was then interested in the company, and told him he was afraid it was not being done right. Mr. Burk told him that it must be all right. He went to the then city engineer, and asked him about it; he advised him that it was not the intention of that department to inspect this work; as I understand this evidence, that a maintenance bond of 100 per cent. had been prepared and executed for the protection of the city and property owners, and that that was sufficient guaranty that the work would be done properly. I don't recall whether he went to see anybody else or not, but these were the people who had charge of this work, and he was urging them to be sure that he was getting what he was expected to pay for. My recollection is that the assistant city engineer told him that they would not put an inspector on the work, that they didn't need any, in the face of that bond, and I think that was the extent of the complaints that were made. I don't think that it could be said here that he stood idly by and saw the improvement being made when he was urging that this experimental work be analyzed very carefully, to see that it was going to produce the results which was claimed for it. The first coat went on, which was followed by the second. Some of the first work that was put on was taken up because it was apparently defective, and taken up at the start, and delayed the work for a day or two, perhaps. Then the second coat was put on, almost all of it,—I have forgotten what portion of the pavement was not finished at the time they discovered this faulty condition. The condition there was horrible, as everybody admits, and the company threw up its hands. Then the new president of the company came and took charge of the matter and with his attorney went to see Doctor Enochs, to see what could be done. They told him that they wanted to do the right thing and wanted to put down a pavement there that would be satisfactory to him and I think told him that they would do that, but they wanted the assurance from him, before they started in, that if they did there would be no further complaint or trouble from him, if they put that down to satisfy him. The work had been delayed there for months and the very fact that this poor piece of paving was put down there would have a tendency to give that addition a black eye to start with, and they wanted to be assured that if they did go to work then and fix that paving so it would be good paving, and in substantial requirement with the specifications and ordinances, that, notwithstanding these damages from having that sort of paving as being in his addition, they wanted his assurance that he would accept it and would not give them any trouble, and I think that there was no question but what he gave them to understand that if they did that it was all he would ask for, and all he wanted. And I think they went at it with the intention of doing that very thing. And they put down the third layer, as they had talked of doing with Doctor Enochs over the second layer, that had already been put down, and which was in fact, very defective, and then put down the second coat in that portion of the addition that had not received any except the first one. In order to do this, in order to remedy the defects which existed, it became necessary to change the elevation of the pavement, as compared with the height of the curbing in some places out there, which necessitated the use of a good deal more material and the leaving of a comparatively low curbing at certain points. And that work was done, and the slimy surface which followed the rain upon the pavement which disclosed the horrible condition up there, was not disclosed, I guess, at that time until after another rain came, when a portion of this third coating was found to be somewhat similar to the one of which so much complaint was made, but just how much of it, I don't know, I don't think the evidence discloses. This third coating, checked, cracked; I think that the contention was made that that crack did not extend down to the sub-base; the statement was made here anyway, whether it was by questions or the answers, that that was the case, and I don't know whether that's true or not. I do know, from what the witnesses say, and from the examination that I made up there that almost the entire pavement is streaked with cracks that extend along the center of the driveway, they run lengthwise with the street, as well as crosswise, or diagonally, from the center, and that in that portion of the street which is most traveled, and I speak now of the particular pavement where these conditions exist, the cracks are in the pavement where the traffic is being conducted, I think the

cracks are just as large and just as pro-
nounced as they are on either side of the
center of that particular pavement, and in
fact I thought they were larger in some
places. I was under the impression,—I had
been told and I think that witnesses have
stated it, that these cracks eventually close
if the travel is pretty constant over it, and
I really expected to see that that was the
case. But, as I say, the cracks are just as
pronounced there, if not more so, than they
were on either side of the track of that par-
ticular pavement. There are other portions
of the pavement that are not traveled at all,
hardly, on Fifteenth street, and on the ex-
tremities of that particular park there,
where the cracks were larger than in other
portions of the pavement. * * * By Mr.
Chambers: Do I understand the court you
say that these parks are chargeable with this
assessment? By the Court: I think so. By
Mr. Chambers: And that that assessment
ordinance is void? By the Court: Yes; I
think so. By Mr. Chambers: But you won't
grant an injunction as to their going ahead
and issuing the bonds? By the Court: The
assessment itself, as made, is invalid, in my
judgment. By Mr. Chambers: But you don't
grant an injunction against the issuance of
the bonds. By the Court: No. By Mr.
Shear: As I understand, the court holds
that the acceptance of the pavement by the
city is conclusive. By the Court: Yes."

We have examined the entire record, in-
cluding the testimony of the witnesses, and
we cannot say that the findings of fact of
the trial court were clearly against the
weight of the evidence, but, upon the con-
trary we think that such findings were sup-
ported by a fair preponderance of the evi-
dence, and in these circumstances, under a
long line of decisions of this court, such
findings should be sustained. Swan v. Dun-
can, 78 Okla. 305, 190 Pac. 678; Parker v.
Tomm, 78 Okla. 103, 188 Pac. 1074.

From an examination of the entire record
in this case, we are convinced that the trial
court, after having obtained jurisdiction of
the parties and of the subject-matter, sitting
as a court of equity, had authority and it
became his duty to retain such jurisdiction
and to administer such relief as the respec-
tive parties were shown to be entitled to at
the hands of the court. Tidal Oil Co. v.
Roelfs, 77 Okla. 183, 187 Pac. 486; Chastain
v. Smith, 77 Okla. 188, 187 Pac. 802.

The record discloses that the contract price
of the improvement in question amounted to
the sum of $38,758, and it is admitted by the
plaintiffs that the price of the grading, curb-
ing, and draining for which the abutting
property is properly chargeable under the
facts and the law amounted to the sum of
$12,000. The record further discloses with-
out dispute that at the time this improve-
ment was completed it had cost the paving

company $18,000 in excess of the contract
price, and that the latter sum was incurred
on the improvement by an understanding
had between the officers of the company
after its reorganization and the property
owners, as presented by Doctor Enochs;
and that after such understanding, and while
the improvement was being completed under
such understanding, none of the property
owners made any complaint that the im-
provement was not being completed in accord-
ance with such understanding.

In these circumstances, we are satisfied
that the judgment of the trial court is equit-
able and in accordance with the law, and
should be fully carried out under such fur-
ther orders of the trial court as may be
necessary to effect a full satisfaction thereof,
between the parties to be affected.

The judgment of the trial court is there-
fore affirmed, and the court directed to take
such further proceedings herein as may be
consistent with the views herein expressed.

HARRISON, C. J., PITCHFORD, V. C. J.,
and KANE and KENNAMER, JJ., concur.
MILLER, J., dissents.

MILLER, J. (dissenting). I dissent from
the opinion of the majority of the court.
The findings of fact made by the trial judge
clearly show that the trial court was not
satisfied with the judgment rendered. After
stating that he had carefully considered the
evidence and at the request of the parties
had made a personal examination of the pav-
ing, he makes this statement:

"I think I have got a pretty good idea as
to the condition that exists there. If the
legal questions that are involved here were
out of the way to the court's satisfaction, I
wouldn't have any hesitancy in announcing
my position, one that has been reached after,
I think, very careful consideration as to the
character of the pavement that is in this ad-
dition, and of the manner of its construction
and of its present value. If it was up to me
to decide these questions, instead of having
been up to the commissioners in the first
place, I would announce a decision that
would meet my approval most heartily."

The findings of fact of the trial court fur-
ther disclose that defendant, paving com-
pany, claimed they had a certain formula,
which was being used elsewhere, that would
make a good substantial paving and be much
cheaper. They took one of the city com-
missioners and one of the property owners to
Independence, Mo., and there exhibited to
them some of this proposed paving.

Most of the commissioners were opposed to
this kind of paving, so was the city en-
gineer. They contracted for it on the urgent
solicitation of the property owners, but they
were so doubtful about it they required a
100 per cent. maintenance bond. Dr. Enochs,

one of the principal property owners in the paving district, watched the paving construction carefully. On about the second day he made complaint that it was not being done properly. This complaint was made to the foreman in charge of the paving, also to Mr. Welty, the president of the paving company, then to Mr. Burke, who had at one time been city engineer of Oklahoma City, but who at that time was interested in the paving company. He told them that the paving was not being put down right, that something was wrong. Each assured him that it was all right. He then went to the city engineer about it. The city engineer advised him that it was the intention of that department to inspect this work, for a maintenance bond of 100 per cent. had been made for the protection of the city and property owners. After further demands, the assistant city engineer told Dr. Enochs that they would not put an inspector on the work.

We again quote from the court's findings:

"Some of the first work that was put in was taken up because it was apparently defective, and taken up at the start, and delayed the work for a day or two, perhaps. Then the second coat was put on, almost, all of it,—I have forgotten what portion of the pavement was not finished at the time they discovered this faulty condition. The condition there was horrible, as everybody admits, and the company threw up its hands. Then the new president of the company came on and took charge of the matter and with his attorney went to see Doctor Enochs, to see what could be done. * * *"

The court then finds that the new president told Dr. Enochs that they wanted to do what was right and put down a good pavement and wanted the assurance of Dr. Enochs that he would be satisfied if they did that. He assured them that all he wanted was a good pavement. They put down a third layer on part of it, and tried to fix it so it would be a good pavement. But the court finds, after a rain the surface was slimy to the extent it disclosed a horrible condition. It checked and cracked, the cracks running in all directions. At the time it was inspected by the trial judge, he observed one place 25 feet in length by three or four feet in width where the paving was worn out, or at least had disappeared. He found that where these cracks occurred he could put his knife blade in the crack and and just lift out chunks of the paving that were loose. He specifically states: "I would not want that pavement put on the street between the house where I live and where Mr. Paul lives; if it were put down there without cost, I would say keep it away."

The trial court then concludes as follows:

"But now, I am going back to the other question, as to whether this court has got any authority. Our law provides that certain tribunals shall have the control of certain matters. They are delegated with certain authority. The courts say that if their acts are all subject to review by the court that it is extending the power of the court far beyond what anybody supposed. Fraud, of course, vitiates everything, and if an officer or tribunal is influenced by ulterior motives, that if fraud enters into their acts, their acts can be reviewed, and the remedy is afforded against it. The question is as to whether this case presents a condition where the court would be justified in saying that the acts of the commissioners in approving this work, notwithstanding the individual members of the commission, I think without exception, believed what some of them termed a rotten piece of work, in other words, a rotten pavement, as to whether this court can say that their decision is subject to review here. Where there was a disputed question of fact, relative to the construction of the pavement, relative to the compliance or noncompliance with specifications, and a hearing is had and the commissioners say:

'We believed all the time that it was a physical impossibility to get a good pavement on that formula, but you insisted that it must be put down in the face of our individual beliefs that you would regret it and that it would not be a good work, we believe from the investigation that we have made, and we have been out there to look at it, and we see here, and there are cracks in here, we will say, I don't know whether there were or not when they were out there—but that's a very common occurrence in driving over town, to see these bad places on any other kind of pavement, and there isn't anything in the specifications that says that cracks shall not appear except that its to be a compact mass; you have got a remedy if that isn't a good pavement; upon judicial inquiry, it should be ascertained that the specifications had not been followed, and the only way on earth that we can tell now whether they have been followed, is by inspection of it, by looking at it, by inquiring about what has been done, by having our chemist investigate to see whether sufficient asphaltum is in there, and from this inquiry we have reached the conclusion that the specifications have been complied with substantially; of course you have got a poor pavement in some portions, than you had before, but that was the result of your own agreement that that sort of thing might be put down; if it would get a good pavement there, why that's all right and that was done; now we have reached the conclusion that you have got just as good pavement there as you could get from those specifications. It may be that if we had had an inspector out there with our chemist, examining each load of material as it was dumped, we might have ascertained that the formula was not followed as it was intended, but we

didn't do that just simply because it was a matter of judgment on our part as to whether we ought to go to that trouble. We have got a bond here that will protect you, but we think they have complied with their contract and we are going to approve it.' Now, that's the situation that occurs to me.

"Take this evidence, these experts: take Doctor DeBarr's testimony, take the samples that have been produced here,—I don't think the dust that was produced here by Doctor DeBarr, after his chemical analysis, is of that dust-like fineness that the Kansas City or that the known sample produced; I don't think they had as good dust as they got at Kansas City, because if you take it up between your thumb and finger it's gritty and while it looks fine, the grit is there that is absent from the other sample, but that was not known at the time this work was approved. An investigation was made,—I believe that the commissioners honestly believed that they had got just as good a job there as they could get from that formula, but I don't believe they have got as good a job as they would have if they had had an inspector out there, with a chemist to examine it. I can't reach any other conclusion. I can't believe that that pavement is such a pavement as anybody had the right to expect there, and as the paving company expected it would be. There isn't any doubt that, I think everybody has been honest in this entire matter from start to finish, but it's just a condition that is presented here which it looks to me as though the court's hands are tied. I regret it very much. I wish it was before me now in the first place, I would knock that pavement out, in less time than it takes for me to tell about it, as under the evidence introduced upon this trial the court finds that said pavement was not constructed in accordance with the plans and specifications."

The city commissioners admitted it was a bad job, but said it was as good a job of paving as you could expect to get from that formula. That is not conclusive on the trial court. The question is not what kind of a job a particular formula will produce, but was this a substantial job of paving? The property owners are not skilled in that particular branch of the science of chemistry, so that they could determine what kind of a paving a certain formula would produce. When the paving company failed to produce a reasonably good, substantial pavement, either because the formula was faulty or because they failed to follow it, there was a failure of consideration. The acceptance by the commissioners amounted to constructive fraud on the property owners, and I do not agree that the court's hands were tied by the action of the commissioners.

The court states in his conclusion that it is not as good a job as would have been obtained if the city commissioners had sent someone to inspect the work as it progressed. We again refer to the last part of the court's conclusions above quoted:

"I wish it was before me now in the first place; I would knock that pavement out, in less time than it takes for me to tell about it, as under the evidence introduced upon this trial the court finds that said pavement was not constructed in accordance with the plans and specifications."

This shows conclusively that it was not as good a job as could have been obtained from that formula.

The property owners, acting through Dr. Enochs, did everything in their power to get a good pavement or have the work stopped. The paving company and the city commissioners disregarded the property owners' appeal to have the paving inspected as it was being put down. The commissioners blinded their eyes to the condition of the paving, and in effect said: "You wanted paving under this formula; now pay for it."

The cities and towns of Oklahoma, and especially the taxpayers, have been abundantly cursed with inferior paving, handed them by the paving companies and accepted by the city officials. Most of the paving is in bad condition and in need of repair long before the expiration of the ten-year period allowed property owners to pay for the same. In some instances the repair work begins almost simultaneously with the signing of the paving bonds by the city officials. Here the paving was absolutely worthless, and so shown to be even before the bonds were signed. The acceptance of it by the city commissioners was an arbitrary act on their part. The property owners were entitled to their deliberate and unbiased judgment. Their arbitrary ruling does not tie the hands of the court. There should be no wrong without a remedy, but in permitting the arbitrary ruling of the city commissioners to stand it constitutes a wrong for which the courts have denied a remedy. I think the judgment of the trial court should be reversed.