### POPP et al. v. MUNGER et al.

No. 17844.    Opinion Filed April 24, 1928.

Rehearing Denied July 17, 1928.

(Syllabus.)

1. **States—Schools and School Districts— Loan of Permanent School Fund on Farm Mortgage—Default of Mortgagor as to Debt and Taxes—Sale of Land for Taxes—Authority of Commissioners of Land Office to Assign Without Recourse Note and Mortgage.**

Where makers of note and farm mortgage, to the Commissioners of Land Office to secure a loan from the permanent school fund are in default for over five years in payment of interest thereon, in default in paying taxes on the land for like period, by reason whereof the lands have been sold for taxes, and a tax deed therefor issued to purchaser and the accumulated taxes are more than $800, and where the note is long past due and no payments made on principal, an assignment, without recourse, of such note and mortgage, for full value, in good faith, in order to protect the school fund, is within the power of said Commissioners.

2. **Same—Foreclosure Action by Assignee of Mortgage—Right of Tax Deed Holder to Judgment Against Landowners for Amount of Taxes Paid Though Deed Invalid for Irregularity in Tax Sale.**

Where, under facts set out above, the assignee of said security sues to foreclose and makes the Commissioners of Land Office, the mortgagors, the holder of tax deed, and others parties defendant, and where such tax deed holder in cross-petition sets up, first, ownership of title under his deed; and, second, if that be denied, his lien for taxes paid on the land, and asks foreclosure, and where mortgagors ask affirmative equitable relief, to wit, that plaintiff's assignment and mortgage be canceled; that the tax deed be canceled; that tax sale be held void, and, that their title be quieted as against all

parties to suit, except certain royalty holders, it is not error for the court to give judgment for such taxes against the owner, the amount and payment not being in dispute, even though such tax deed be held invalid, for irregularity in advertising of sale for taxes.

**3. Same—Interest—Validity of Provision in Note and Mortgage for Ten Per Cent. Interest After Maturity.**

Where the Commissioners of the Land Office make a loan from the permanent school fund of the state for the period of five years, secured by first mortgage on a farm, the interest on said mortgage to be for the full term at five per cent., a provision in the note and mortgage representing the loan providing for ten per cent. interest after maturity is not, to the extent of such excess, in conflict with section 10232, C. O. S. 1921, providing that the interest on farm loans from said permanent school fund shall not exceed five per cent. per annum.

Commissioners' Opinion, Division No. 1.

Error from District Court, Garfield County; Charles Swindall, Judge.

Action by G. E. Munger, assignee of note and mortgage made to Commissioners of the Land Office, against Phillip W. Popp et al., for judgment on note and for foreclosure of mortgage. Cross-petition by C. E. Gannon, tax deed holder, first, for title to the land, or, if that be denied, for judgment against owner for amount of taxes paid, and for foreclosure of tax lien. Judgment for plaintiff for foreclosure awarded, subject only to superior lien for taxes paid by C. E. Gannon. Popp et al. bring error. Affirmed.

Crowe & Crowe, for plaintiffs in error.

Simons, McKnight & Simons, for defendants in error.

BENNETT, C. This was a civil action tried in district court of Garfield county, Okla. There was a judgment for the defendants in error against the plaintiffs in error, and from which this appeal is taken. The parties will be referred to as they appeared below, that is, G. E. Munger, plaintiff, C. E. Gannon, as cross-petitioner, and the parties plaintiff in error as defendants.

Plaintiff's petition alleges that he is the owner of a certain note and interest coupons thereto attached, together with real estate mortgage securing the same, executed November 11, 1919, by defendants Phillip W. and Mary E. Popp to Commissioners of the Land Office of the state of Oklahoma; that the said note, coupons and mortgage were assigned to him by Commissioners of the Land Office December 9, 1925; that the notes

were unpaid and past due, and he prayed judgment on the notes and for foreclosure of the mortgage. An answer and cross-petition was filed by C. E. Gannon, cross-petitioner, in which he claimed to be owner of premises described in the mortgage under certain tax deed delivered to him by county treasurer of Garfield county June 21, 1924.

The defendants filed answer to petition of plaintiff challenging his right to maintain the action, alleging that assignment of note and mortgage by Commissioners of Land Office to plaintiff was not authorized, and was void, and that they were owners and in possession of the land described in mortgage and that they were entitled to have their title to said lands quieted as against the plaintiff, and asked that they be decreed the owners in fee simple of the premises, and their title quieted as to the claims of all other defendants, except the royalty holders. The answer of Phillip W. and Mary E. Popp sets out that the tax sale under which C. E. Gannon claimed title to said premises was void for the reason that no notice preceding delivery of tax deed was served upon them, and that they were not served with the 60-day notice as required by law. They further tender in court the various amounts of taxes paid upon said premises by C. E. Gannon covering the years 1919, 1920, 1921, 1922 and 1923. They pray that the said C. E. Gannon be required to accept said tender in open court, and that his tax deed be set aside, held for naught and released as a cloud upon title to said premises.

Commissioners of the Land Office of the state of Oklahoma filed an intervening petition asking for foreclosure of said mortgage against the defendants. Later they applied to withdraw said pleading upon the ground that they had no interest in the controversy —having sold their note and mortgage sought to be foreclosed to G. E. Munger. This application was by the court later allowed; and thereafter said Commissioners, upon request of plaintiff, were made parties defendant, and subsequently filed their motion to dismiss the action as to themselves for that they had no interest in the controversy, but their motion was overruled, and they filed no further pleadings in the cause.

Numerous other pleadings not necessary to be abstracted here were filed. On July 24, 1926, plaintiff was awarded judgment for amount due on promissory note and foreclosure of his mortgage, subject only to a superior lien in behalf of C. E. Gannon, cross-petitioner, for the amount of taxes

paid by him on said property aggregating, $826.41.

The court, upon request, made separate findings of fact and conclusions of law, hereinafter referred to.

The evidence discloses that on November 11, 1919, Commissioners of the Land Office made a loan in the sum of $6,200 to Phillip W. and Mary E, Popp out of the school fund under their management, and took from said defendants a note secured by mortgage on northwest quarter of section 18, township 22 north, range 4 west I. M., in Garfield county. This was the homestead of mortgagors. This loan was payable five years after date. In the mortgage Phillip W. and Mary E. Popp agreed to pay all taxes and assessments levied against said premises to protect mortgagees. No interest, except $78, was ever paid on this note. No taxes were paid on this land, and C. E. Gannon obtained a tax deed therefor by reason of being owner of tax certificates for years 1920, 1921, 1922 and 1923.

On December 29, 1924, plaintiff took over the original mortgage and note aforesaid, and paid therefor the sum of $7,698.35, which was the full amount principal and interest due thereon. Upon the payment whereof, Commissioners of the Land Office, in meeting assembled, resolved to assign and transfer, and thereupon did transfer without recourse in any event, to said Munger, said note and mortgage. The paper writing evidencing such action was signed by the Governor, chairman, and attested by the Secretary of the Commission with seal attached. The facts in this case are undisputed.

Five specifications of error are set out in the defendants' brief, but they are argued under three heads, and we shall discuss them in the order in which they are presented in defendants' brief.

**1.  Was the assignment made by the Board of School Land Commissioners to G. E. Munger void?**

Defendants' contention on this point: That no express authority is given to the Commissioners for the assignment here in question, and before the action of an officer can be deemed valid and binding, it must be supported by express authority of law. First, is there legal authority vested in Commissioners of the Land Office to make an assignment without recourse of the note and mortgage? This, we think, should be determined by the words of the Constitution creating the Commission, specifying its purpose and the legislative enactments follow-

ing and supplementing the constitutional provisions.

Article 6, sec. 32, of the Constitution provides:

"The Governor, Secretary of State, State Auditor, Superintendent of Public Instruction, and the President of the Board of Agriculture, shall constitute the Commissioners of Land Office, who shall have charge of the **sale, rental, disposal, and managing** of the school lands and other public lands of the state, **and of the funds and proceeds derived therefrom,** under rules and regulations prescribed by the Legislature."

It is clear from a casual reading of the sections of the Constitution that it was intended that the school fund should be a perpetual fund; that there should be no waste or diminution thereof, and if, per chance, there should be a loss from any cause in said fund, that such loss should be made good; that the body of the fund should remain inviolate and be invested and the earnings only thereof used for the purpose of its creation. It is observable also that in naming the Commissioners of the Land office, our highest officers were made responsible to the state by the Constitution for the preservation and proper use of this fund. It is true that no bonds were required of these five men, but the positions they occupy were, we think, regarded by those who wrote the Constitution sufficient assurance that the integrity and purpose of this fund should be sacredly guarded by these five high officers of our state. It is argued by counsel for defendants that, since these men are not under bond, it was the intention of the Constitution to put sufficient safeguards about this fund so that it could not be the object of any business discretion. Is this narrow view supported by the words of the Constitution? These Commissioners are charged and vested with the power of sale of the school lands of this state—running into millions—and the Constitution uses the same words with reference to the disposition of the school land that it does with reference to the funds and proceeds derived therefrom. What are these words?

"**Shall have charge of the sale, rental, disposal,** and **managing** of the school lands and other public lands of the state, and of the funds and proceeds derived therefrom, under rules and regulations prescribed by the Legislature."

Striking from this clause the reference to land, we have then the power of these Commissioners expressed in the following words:

"Shall have charge of the  sale, rental,

disposal and managing * * * of the funds and proceeds. * * *"

Each of the words of authority mentioned in the constitutional provision, supra, is a general and comprehensive term, and the interpretation of the same should involve no uncertainty or ambiguity. A sale is a contract whereby one acquired a property in the thing sold and the other parts with it, for a valuable consideration. Cole v. Laird, 121 Iowa, 146, 96 N. W. 744. See, also, 4 Words & Phrases (2nd Series) pp. 436 to 454. The word "disposal" is a word of broad significance, and is thus defined by Webster:

"* * * To exercise control over; * * * to direct or assign for a use; * * * to pass, over into the control of some one else; to alienate; to bestow; to part with; to get rid of, as to dispose of a house, or to dispose of one's time."

In the case of Koerner v. Wilkinson, 96 Mo. App. 510, 70 S. W. 509, the court, in discussing the meaning of the word "disposal," said:

"We think the sense to be attributed to the word, as used in the statute, should be its most common one, to wit, to alienate as by sale, gift, or devise."

The word "dispose" includes the power to dispose of property absolutely or conditionally. Clute v. Loveland, 68 Cal. 254, 9 Pac. 133. See, also, cases cited in 3 Words & Phrases, pp. 2113 to 2119.

The word "manage" means to determine; to carry on; to conduct; to control; to direct; to govern; to handle; to have under control and direction. 38 C. J. 521.

In the case of Carleton v. Goebler (Tex.), 58 S. W. 829, a will contained the words "he will take charge of the estate and manage it to the best advantage for the benefit of my creditors." It was held that under these words the executor had power to make a sale of the property of the estate. It should, seem clear, then, that ample and plenary authority was vested in the Commission to sell and indorse, in such manner as would not bind the state, the note and mortgage in the case at bar under the existing circumstances. And what were those circumstances? A note and mortgage long past due and, in default, the interest unpaid for five years, no payments on principal, no taxes paid on the real estate covered by the mortgage for four or five years, the property sold for taxes and tax deed issued, the amount principal and interest due on the mortgage $7,698.35 on original loan of $6,200 and taxes accumulated against the property aggregating $826.41. The Commissioners, in the exercise of sound business discretion, were, it seems to us, compelled to do one of two things—either sue on the note and for the foreclosure of the mortgage, which would, result necessarily in further accumulations of interest, penalties, and considerable delay, or to dispose of the security if they could, find a purchaser who would pay the amount of principal and all interest due thereon. They chose the latter course and found a purchaser who would pay to the state the exact amount of its loan and all interest thereon and take an assignment without recourse from the Commissioners. Can it be said, under the circumstances and in consideration of the powers granted them by the Constitution, that these trustees could not dispose of the security as indicated? It must not be lost sight of that this note and mortgage, though mere scraps of paper, were a part, nevertheless, of the school funds over which these Commissioners were to have not only oversight and management and control, but also the right of disposal, in so far as the same might be necessary, to protect the fund under their care. The Legislature, by section 10231, C. O. S. 1921, provided:

"The Commissioners of the Land Office, consisting of the Governor, the Secretary of State, State Auditor, Superintendent of Public Instruction, and the President of the Board of Agriculture, are hereby authorized and empowered to manage, loan, invest and deposit the permanent school fund donated to the state of Oklahoma by the Congress of the United States, or arising from the sale of lands and from other sources."

It will be observed that the Legislature used almost the same language as the Constitution, barring the words of authority, the Legislature using the words "manage, loan, invest and deposit." We do not think that this section in anywise limited the power already given the Commissioners by the Constitution. No additional power was necessary. All that was required, if anything, was such rules and regulations as the Legislature might see fit to make. We do not interpret the above section as a rule or regulation; but even these more restricted words, when construed in the light of other sections of the Constitution and of the statutes having reference to the purpose for which this fund was created, and the disposal of its earnings and the provision for its being kept always inviolate and intact, might warrant us in coming to the same conclusion. We have already discussed the comprehensive meaning of the word "manage."

The word "invest" is defined by 33 C. J., p. 807, as follows:

"Invest—to convert into some other form of wealth usually of more or less permanent nature; to employ for some profitable use; to place so that it will be safe and yield a profit; to surround with or place in."

In the case of LaBelle Iron Works v. U. S., 256 U. S. 377, 65 L. Ed. 998, the court says:

"* * *'To invest' imports a laying out of money or money's worth either by an individual in acquiring an interest in the concern, with a view to obtain income or profit from the conduct of its business, or by the concern itself in acquiring something of permanent use in the business; in either case involving a conversion of wealth from one form into another suitable for employment in the making of hoped for gains."

In the case of Jones v. A., T. & S. F. R. Co. (Mass.) 23 N. E. 43, the court says:

"When personal property is given in trust, a power in the trustee to sell it, and to reinvest the proceeds, may, however, sometimes, be implied from the nature of the property and of the trust, when the same power would not be implied if the property were land. * * * The discretion which our laws give to trustees in making investments, when no specific directions are given by the creator of the trust, requires that a somewhat more liberal view be taken of the implied power of trustees of personal property to change investments than has been taken in England and in some other jurisdictions."

In the case of Robinson v. Robinson (Me.) 72 Atl. 883, the court, in construing a power directing a trustee to invest and manage property, quoted in part from the case of Harvard College v. Weld, and used the following language:

"In Harvard College v. Weld, 159 Mass. 114, 118, 34 N. E. 175, the court says that: 'The foregoing considerations seem to us sufficient to show that the testator did not intend or attempt to make the land in question inalienable when it reached Harvard College, and that the first words of the trust imposed upon it "to manage and invest the same to the best advantage" carry a power to sell.' It would seem that the words 'invest and manage' properly import and imply a power of sale, unless a contrary intention on the part of the testator can be found in the will taken as a whole."

These cases deal with the construction of these words when used to empower private individuals to act. The case at bar, of course, deals with public officials, but as to the interpretation of the words themselves, it would seem that these cases are illuminating. At any rate, the words in the case at bar, which deal with the power of the Commissioners, are much stronger than those just noted, because, first, they are the words of our fundamental law, the Constitution, and, second, because they include the additional words, "shall have charge of the sale, rental and disposal." It is true that the latter part of article 6, sec. 32, provides that these disposals, rentals, sales, etc., shall be "under rules and regulations prescribed by the Legislature," but the Legislature having provided the nature of the securities in section 10232, C. O. S. 1921, and determined the preference which should obtain among such securities, and since the Legislature has not even attempted to lay down any specific qualifying or restrictive rules, it must appear that those were the only rules deemed essential and necessary by the Legislature, and that the Commission should, therefore, proceed to act under its power directly granted by the Constitution. In short, the Legislature has not seen fit to impose any special rules governing the Commission, except the selection of such securities as were thought best to promote the purpose of the fund under the Constitution, and fixing of rate of interest. If anything were needed to emphasize this disposition of the Legislature, it may further be seen by section 10238, which reads as follows:

"The Commissioners of the Land Office are hereby authorized and empowered to make all necessary rules and regulations for the purpose of carrying into effect the provisions of this law."

The constitutionality of this latter act is not here discussed, for the reason that the only purpose in quoting the same in this opinion is to indicate that the Legislature had in mind not to make any further rules in the premises.

What, then, was the power given the Commissioners under the Constitution? Manifestly, to proceed to dispose of, manage, control, and administer the fund for the purpose of its creation. From an examination of all the constitutional and legislative enactments, it is beyond question that the writers of the Constitution, as well as the lawmakers, generally, have regarded this as a sacred fund, the integrity of which was to be preserved at all hazards, and that it was to be loaned to the citizens of this state with the sole purpose of having the interest therefrom applied to the education of the school children of Oklahoma. With that clearly in mind, could it be possible to suppose that it was the duty of the Commissioners to hold these funds idle simply because the Legislature had decided not to promulgate any rules for their government,

except the ones hereinbefore referred to? The very fact that the Legislature passed some rules is conclusive evidence to us that they meant that those should be exclusive under the general doctrine of *expressio unius est exclusio alterius.*

Finally, if the Commissioners had the right to dispose of, handle, manage, invest, and control this fund, and properly invested $6,200 of the same in the note and mortgage sued on in the case at bar, was their right of supervision, control, and disposition of the security at an end? Could it be successfully argued that when the interest on this security was five years in default, the taxes on the property representing the security were unpaid for an equal period, and when these accumulations of interest and penalties were rapidly eating up, if they had not already destroyed, the margin of security, that these trustees, charged with the preservation of the integrity and correct handling of this fund, could not dispose of said investment or said security by transferring it without recourse in exchange for the face value, principal and interest, of the security? Such a position, we think, is entirely unreasonable.

It is argued that no specific authority is given the Commissioners to sell these securities. Without conceding the point, it might be remarked that no specific authority is given the Commissioners to release a mortgage already taken, or perhaps to foreclose a defaulted mortgage, but it must needs follow from the very purpose of the fund and from the nature of the trusteeship and the purpose of the creation of the fund, that these incidental powers should follow. It is likewise argued that the Constitution does not authorize the Commissioners, to traffic in these mortgage securities. Somehow, we are not able to interpret the transfer without recourse of a doubtful and dishonored and long past due money obligation for the exact amount of principal and interest due to protect a trust fund as coming under the designation of trafficking in securities. Rather, we think, it comes under the head of performing one of those incidental, ordinary, prudent and highly necessary acts that would be indispensable in a trustee who had a decent regard for the objects and purposes of his trusteeship; and the refusal to perform it and hazarding the loss of the fund by litigation, and the accrual of further incidental charges, would be distinctly a mismanagement of a trust fund; and we hold, therefore. that, under the circumstances of this case. the Commissioners of the Land Office were within their rights, and that plaintiff acquired a good title to the securities herein sought to be foreclosed. This disposes of the first and second points argued by plaintiff in error.

3. Did the court err in rendering judgment in favor of cross-petitioner for the amount of taxes on this property which he had paid? Our answer to this question is "no." It is beyond question that Frank Suttle paid the taxes for the year 1919; was the purchaser at a sale of said land on November 1, 1920; received his certificate of purchase and thereafter assigned the same to C. E. Gannon, who paid the taxes for the years 1920, 1921, and 1922, and caused the same to be indorsed upon the tax sale certificate which had been indorsed to him as aforesaid by Frank Suttle; that said property had never been redeemed nor the amount of taxes paid to Gannon. The legality and the amount of these taxes are not in dispute. The court held that the tax deed was regular on its face, but that the sale was irregular, and that the deed therefore should be set aside. Plaintiffs in error argue that. since the sale was void, Gannon is not entitled to the recovery of even the taxes legally assessed against the property, and which he paid upon the strength of his purchase certificate and the benefit whereof inured to defendants, the owners of the property.

It will be noted, first, that in defendants Popp's answer and cross-petition, they ask affirmative relief. They ask that the interest of codefendants be declared invalid as against these defendants, and inferior to their rights, except as to certain royalty interests; that the sale for taxes be declared invalid, and the tax deed inoperative and a cloud upon their title to the land, and that the same be canceled and that their title to said land be cleared and quieted in them against all these conflicting claims; and in the same paragraph of their answer, they tender these identical taxes and pray the court to require Gannon to receive the same in discharge of his claim. In short, defendants plead for and invoke the equitable power of the court, and, in fact, they received the benefits of the equitable power of the court. It is elementary that he who comes into equity must come with clean hands, and, further, that he who seeks equity must do equity. Therefore, having asked and received the benefits of such power, it would seem entirely out of harmony that they should not be required to pay the taxes on their own land, or to re-

pay such taxes which had been paid by another, resulting in the discharge of their land from the lien.

It is true the court was asked to allow them to withdraw the tender, and the court found that the tender had been withdrawn. This clearly appears to have been a mistake in the record, for we have examined the record with care, and we do not find one word therein to indicate that the request was ever passed upon. The finding is, therefore, clearly based upon a mistake as to the record. We could hardly assume that if this plea were presented to the court in the light of the answer made, the court would have permitted the withdrawal of this tender. But, irrespective of that, the lower court required defendants to pay exactly what they ought to have been made to pay, to wit, the taxes on their land, the benefits of which they have had, and they ought not now to complain. Since their lands nave been freed from the lien by the discharge of the tax, it would be intolerable to permit the defendants, under the pleadings, to escape this burden and by a, specious plea to a court of conscience shift their burden to the shoulders of another. Even on the last page of their main brief they ask of this court the cancellation of the assignment of their note and mortgage to the plaintiff, and that the same he removed as a cloud from their title; likewise, for the cancellation of the tax deed as a cloud on their title, and also for the quieting of their title in the premises as against the plaintiffs, the cross-petitioners, and codefendants. Defendants were not compelled to ask affirmative equitable relief, but having done so, this court will see to it that when they ask the benefits, they shall shoulder those proper burdens which accompany relief granted by such court. A party in such position is bound to do justice and may not ask the court to become an instrument of iniquity: Nellis v. Minton, 91 Okla. 75, 216 Pac. 147; Cosden Oil & Gas Co. v. Hendrickson, 96 Okla. 206, 221 Pac. 86; McDonald v. Bohling, 102 Okla. 243, 228 Pac. 873; Interstate B. & L. Co. v. Oklahoma City, 84 Okla. 227, 203 Pac. 172; Stevens v. Elliott, 30 Okla. 41, 118 Pac. 407; Skidmore v. Leavitt, 73 Okla. 196, 175 Pac. 503; Callander v. Brickner, 97 Okla. 37, 222 Pac. 531 (and the discussion of secs. 7417 and 7419, Rev. L. 1910, contained therein). See. also, the cases of Levy v. Inman, 103 Okla. 90, 229 Pac. 436, and Stewart v. Burrows, 80 Okla. 23, 193 Pac. 881.

From these authorities, we conclude that the court properly gave judgment to the cross-petitioner for the taxes paid by him in the sum of $826.41, together with interest at 18 per cent. per annum.

With reference to the final point urged, we are of the opinion that the trial court did not err in allowing ten per cent. interest after default. It is true section 10232, C. O. S. 1921, provides:

"All of the permanent school funds shall be invested in first mortgages upon good and improved farm lands within the state. * * * The interest on said farm loans shall not exceed five per cent. per annum."

What is the meaning of the words "the interest on said farm loans shall not exceed five per cent. per annum?" In order to solve this question, some provisions of law should be borne in mind: (1) That this is a sacred fund, under the Constitution and under our law, to be preserved inviolate always, and if it in any way shall be depleted, the loss shall be promptly made good. (2) That the interest and income of these loans are dedicated alone to the education of the children of Oklahoma. (3) That the handling of these funds is committed to the honor of our highest state officers, and their integrity is our sole security for its faithful administration. (4) Under section 10235, C. O. S. 1921, the Commissioners are required to report to each Legislature the condition and management of these funds. (5) That the following are facts of which the court will take judicial knowledge: (a) That the interest rate on farm loans in Oklahoma ranges from six to eight per cent., and usually a commission of one per cent. per annum is paid in addition; (b) that a great stimulus to the prompt payment of loans is provided by a requirement of a higher rate of interest after default. (6) That the interest rate uniformly provided for purchases of the public lands in this state is five per cent. (7) Under paragraph 9326, C. O. S. 1921, which has to do with the sale of the public lands, there is the following clause:

"Provided, that the Commissioners of the Land Office shall charge ten per cent. interest upon any deferred payments and interest, after the same have become due and payable."

It was conceded in the argument that it has been for years the custom of the Commissioners of the Land Office to provide in their real estate mortgages a rate of ten per cent. interest after default. It seems to us reasonably clear that when these loans are made at five per cent., running, say, for a period of five years, the spirit, if not the very letter, of the statute has been complied with. There is no agreement for any loan for an additional period. If any such

enforced period results, it is neither by act nor contract of the Commissioners of the Land Office, but arises solely out of the clear default of the mortgagor. These mortgages run for a long time, and for good cause shown they are subject to renewal. When, therefore, a defaulting mortgagor permits his mortgage to expire by limitation and his interest payments to fall in arrears, he is bringing about a forced loan to which the state has not agreed, and it seems to us a proper stimulus in the way of additional interest for such a period to which the state has not assented is not contrary to the statute. Since these loans are to be made under the rules and regulations of the Legislature, and since the Commissioners are required to report to each session of this body, not only the condition, but the management of the fund, it is no great step to assume that the Legislature has given its tacit or implied consent or assent to the terms set out in these mortgages, the provisions of which must, in the nature of things, have been brought over and over again to their direct attention.

Of course, if the provision for ten per cent. in the instant case, or in any case, were used as a device to avoid the statutory provision for the interest charge of five per cent., and not, as here, only to secure prompt payment, it would be and should be held as violative of the spirit of the act, but that is not the case at bar. We might say, in closing, that the contention of a mortgagor, who has permitted his mortgage to run for five years, the full period, without payment of principal or interest and without having paid the taxes on his real estate, and thereby has permitted the same to be sold for taxes, and thereby compelled the state to institute foreclosure, not only against the mortgagor himself, but against the purchaser under the tax sale, furnishes no strong appeal to this court.

For the reasons given, we hold that the court below did not err in allowing the judgment for interest and attorney's fee, and by reason whereof we hold that the judgment of the trial court should be affirmed.

TEEHEE, JEFFREY, DIFFENDAFFER, and HERR, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 36 Cyc. p. 888. (2) 37 Cyc. p. 1537.