**KILLMER PAINT & GLASS CO. et al. v. DAVENPORT-BETHELL CO. et al.**

*No. 18491. Opinion Filed May 14, 1929.*

Benjamin C. Conner, Floyd E. Staley, and Wm. D. Godfrey, for plaintiffs in error.

Fred D. Oiler, for defendant in error Davenport-Bethell Company.

E. M. Conner, for defendant in error L. S. Cogswell Lumber Company.

DIFFENDAFFER, C. The parties appear as in the trial court, and will be referred to herein as plaintiffs and defendants.

This is an action in the nature of an action for breach of trust. It appears from the record that sometime prior to May, 1924, A. F. Waid and wife purchased lot 11 in block 9 in Sunset Terrace addition to the city of Tulsa, upon which they undertook to erect a dwelling house, which property will be herein referred to as the "Waid property." The Waids owed about $2,500 on the purchase price of the lot. Defendant Davenport-Bethell Company (whose name at that time was Davenport, Ratcliff & Bethell) executed a construction mortgage to that company for $2,500, out of which was paid $1,000 on the balance due on the purchase price of the lot, leaving a balance due, which when later paid amounted to $1,591.94. The balance of the money for which the $2,500 mortgage was given was advanced to the Waids towards the construction of the dwelling. About this time, the Davenport-Bethell Company negotiated a loan from the Aetna Building & Loan Company for the Waids, and a mortgage was executed by the Waids to the loan association for $9,250. There was available from said mortgage in July, 1924, the net amount of $9,180.37. In the meantime Davenport-Bethell Company had advanced labor, material, etc., over and above their $2,500 mortgage to the amount of $463.15, and defendant L. S. Cogswell Lumber Company had furnished lumber and material amounting to $2,682.16, and plaintiffs and certain others had furnished lumber and material in various sums, aggregating about $6,322.84, all of which was unpaid, and materialmen's lien and mechanics' lien had been or were about to be filed against the property.

The approximate amount of the mortgages, claims, and liens against the property was $16,285, and the dwelling was not completed. Out of the net proceeds of the building and loan mortgage of $9,180.37, the $2,500 mortgage of Davenport-Bethell Company was to be paid, leaving only about $6,680, with which to pay the unsecured claims amounting to about $9,518. On July 18, 1924, defendants had secured a deed to the property from the Waids, and thereafter, on July 24th, defendants and plaintiffs entered into an agreement in the nature of a trust agreement, whereby plaintiffs agreed to waive their respective liens for labor and material, and agreed not to file any lien or liens against the property, and it was further agreed that, in event defendants should make sale of the property at any time thereafter, the proceeds of such sale, less carrying cost of the mortgage, should be divided between all the parties in proportion to their respective interests and claims, and that in event there should be a loss sustained in the sale and disposal of the premises, then all the parties were to bear their respective loss or losses in a like proportion. It was then agreed that, should it become necessary in the sale of the premises to take a second mortgage for any part of the purchase price, then all of the parties should have an interest in such mortgage in like proportion, and when such mortgage should be paid or sold, each should receive his proportionate share. The contract then provided:

"It is further agreed by and between the parties hereto that the parties of the first part shall be and hereby are appointed trustees, for and in behalf of second parties, to take charge of said property and rent the same, and collect the rents, issues, and profits arising therefrom, and to sell and dispose of said property in the best possible manner, and divide the net proceeds arising from the rents and sale of said property in proportion as hereinbefore provided."

Out of the $6,680 remaining from the pro-

ceeds of the building and loan mortgage, plaintiffs were paid 50 per cent. of their respective claims. This payment was made on July 31, 1924, and after that date, nothing was paid on plaintiffs' claims.

The Waid property was held by defendants until on or about March 12, 1925, when defendant Davenport-Bethell Company executed a quitclaim deed conveying its interest in the Waid property to its cotrustee, L. S. Cogswell Lumber Company. On the same date, the defendant lumber company deeded the property to Agnes L. Ames, from whom it received a consideration of $8,000 cash and $2,000 notes (which were cashed for their face), making a total of $10,000, and in addition thereto received title to a house and lot on North Tacoma avenue, referred to in the record as the "Tacoma property." As a part of this trade, it was planned by the trustee that it would be necessary to make improvements on the Waid property and certain improvements on the Tacoma property, and that a mortgage of $5,000 be placed upon the Tacoma property, and the same to be sold to a third party for $8,000, including the assumption of the $5,000. This plan was outlined to some of the plaintiffs to whom it was suggested that thereby each plaintiff would recover the full amount of their claims, less 20 per cent. Others of the plaintiffs were not apprised of this plan, but those to whom it was explained assented thereto. This plan was carried into effect to the extent of placing the $5,000 mortgage on the Tacoma property and making the improvements mentioned, but the deal with the third party fell through and the sale was not consummated. The expense of procuring the $5,000 loan on the Tacoma property was $262.42. so that the net amount realized was $4,737.58. The trustees then received as a result of these transactions $10,000 cash proceeds from the Waid property, and $4,737.58, the net amount realized from the loan on the Tacoma property. This money was paid out by the trustees as follows:

"(a) In payment of the $9,250 mortgage in favor of the Aetna Building & Loan Association on the Waid property.

"(b) The balance due on the Sunset Gardens Company mortgage amounting to $1.591.94.

"(c) Repairs on the Waid property.

"(d) Repairs on the North Tacoma property in the sum of $771.50.

"(e) Payment on the $5,000 mortgage on the Tacoma property of $126.

"(f) To Davenport-Bethell Company in full of its unsecured claim $463.15.

"(g) An additional amount to Davenport-Bethell Company of $38.54, representing interest on the amount last mentioned."

After these payments were made, the title to the Tacoma property was in A. W. Hine, secretary and treasurer of the L. S. Cogswell Lumber Company, free from all liens except the $5,000 mortgage, upon which there had been paid $174.14, and there remained in the hands of the trustee $235.24.

The Tacoma property was thus held until May 25, 1925, at which time the equity in this property was traded for two vacant lots in Davis-Wilson Heights addition to Tulsa, referred to in the record as the "North Cincinnati avenue property," and title taken in the name of L. S. Cogswell, president of the L. S. Cogswell Lumber Company. A mortgage of $4,000 was placed upon this property, and a house erected thereon. The property was later transferred to the L. S. Cogswell Lumber Company. None of the plaintiffs appear to have been informed of this latter transaction until after the deeds were passed, and none of the plaintiffs assented thereto. Hine, who conducted the trade and built the house, apparently relied upon the terms of the trust agreement to permit him so to do. Title was taken to the properties in the name of Hine and Cogswell in order that the mortgages might be placed thereon. In building the house on the North Cincinnati avenue property, the payment of expenses in procuring the $4,000 loan, the payment of installments on this loan, and general and special taxes, the L. S. Cogswell Lumber Company expended all the $235.24 it had left in its hands after repairing the Tacoma property, all the proceeds of the $4,000 loan, and $250 rent it received for the North Cincinnati property, and itself advanced the sum of $1,115.71. In making the improvements on the three properties, the L. S. Cogswell Lumber Company furnished itself building material to the total extent of $2,077.54, at a price whereby it made a net profit thereon of ten per cent. or $267.75.

These are, substantially, the findings of fact made by the trial court, which plaintiffs admit are binding upon them, and with which they were apparently satisfied since they did not bring up the evidence upon which the findings were based.

This action was brought and defendants sought to be charged with the balance due plaintiffs upon the theory that the trust agreement only authorized the defendants as trustees to sell the Waid property, and that, when they disposed of it, they took

as a part of the consideration the Tacoma property, which plaintiffs claim defendants were not authorized to, and they allege that the value of the Tacoma property was $8,000; that defendants ought to be charged with its value, which would be sufficient to pay plaintiffs in full.

Issues were joined and the case was tried to the court, who, after having heard the evidence, at the request of plaintiffs, made findings of facts substantially as stated above, and conclusions of law as follows:

"First. That there being no evidence of bad faith on the part of the trustees, that the plaintiffs are compelled to follow the trust funds and are not allowed to complain at the trade of the Waid property for the Tacoma property or of the Tacoma property for the North Cincinnati property, or of the mortgaging of the latter two properties and the building of the house upon the North Cincinnati property.

"Second. That Davenport-Bethell Company was entitled, under the terms of the contract of July 24, 1924, coupled with the provisions of the contract of July 18, 1924, to pay itself in full the unsecured claim of $463.15, but was not permitted to charge the item of $38.54 as interest on said item.

"Third. That L. S. Cogswell Lumber Company was not permitted to profit for material sold by it to itself as trustee in the improvements of any of said property, and there shou'd be deducted from its claim of $1,115.71, the sum of $207.75, making the total amount advanced by the L. S. Cogswell Lumber Company to said trust estate $907.96.

"Fourth. That Davenport-Bethell Company should immediately pay to L. S. Cogswell Lumber Company, as trustee, the sum of $38.54 to be credited on the $907.96, and the balance of $869.42 shou'd be declared a first lien on the North Cincinnati property junior only to the mortgage in favor of the Fidelity Building & Loan Association."

Judgment was then entered denying judgment in favor of plaintiffs and against defendants for alleged breach of the trust agreement and in accordance with the conclusions of law reached, and ordering the North Cincinnati avenue property sold and the proceeds applied: First, to payment as costs; second, to the repayment of L. S. Cogswell Lumber Company's lien, and the balance, if any, to be prorated among plaintiffs and defendant L. S. Cogswell Lumber Company in proportion to the amount of their respective claims remaining unpaid growing out of the original building on the Waid property.

Plaintiffs appeal, and set out five assignments of error, but in their brief say they may all be summarized under the sixth assignment, which is:

"(6) That the court erred in not finding, as a matter of law, that the defendants in error, as trustees, had misappropriated trust property and made themselves liable to plaintiffs in error for damages for such misappropriation."

The real question is, Did the court err in concluding, as a matter of law, that the defendants did not violate the terms of the trust agreement? Plaintiffs contend that by reason of that section of the agreement, which reads:

"It is, further mutually agreed by and between the parties hereto that the parties of the first part shall be and hereby are appointed trustees, for and in behalf of second parties to take charge of said property and rent the same, and collect the rents, issues and profits arising therefrom, and to sell and dispose of said property in the best possible manner, and divide the net proceeds arising from the rents and sale of said property in proportion as hereinbefore provided"

—they were required to sell the Waid property, and that the deal they made, whereby they disposed of the same for part cash and partly in exchange for other property, was a violation of the trust agreement, and rendered defendants liable to plaintiffs on account thereof.

The position of plaintiffs is that the phrase in the agreement, "sell and dispose of said property in the best possible manner," did not authorize defendants to make the trade and exchange shown by the record. In support of this contention, plaintiffs cite Pearson v. Orcutt (Kan.) 189 Pac. 160; Beakey v. Knutson (Ore.) 174 Pac. 1149, and other kindred cases. Pearson v. Orcutt, supra, is a case construing a will by which the widow was given a life estate in certain property, "with power to sell and dispose of the same in any way she may direct without the intervention of any court during her natural life." It was there held that the widow was without power under the will to dispose of said property as a gift, without receiving any consideration therefor.

An examination of that case will disclose that the grounds for holding the lack of power to dispose of the property by way of gift and thus impoverish the estate, was not based so much upon the phrase quoted as upon other provisions of the will intended for the benefit of the children of the testator.

Beakey v. Knutson, supra, is a similar

case. There the words "sell, dispose of, and use in any way she may deem proper," were relied upon by the widow as authority to mortgage, not for the benefit of the estate, but for the benefit of herself and her newly-acquired spouse. It was there held that such authority was not granted by the will. But, again, it was held that other provisions of the will relative to benefits to the children of the testator were controlling, and by which she was deprived of the power to mortgage for the purposes stated, viz., nourishing, caring for, maintaining, and educating the children, that being the only purpose justifying a sale. The court said:

"Whatever the executrix might do under the terms of the will, she is not authorized to confederate with a new matrimonial consort, and hypothecate the testator's estate for the benefit of herself and her new mate. The circuit court was wrong in sustaining a demurrer to the complaint, for it does state facts sufficient to constitute a cause of suit. The decree is reversed, and the cause remanded for further proceedings not inconsistent with this opinion."

It is contended by defendants that trustee agreements of the nature of the one here under consideration are not to be governed by the strict rules of construction of trusts provided for in wills. The authorities cited seem to support this contention. Ainsa v. Mercantile Trust Co., 174 Cal. 504, 163 Pac. 898.

As we view the law, the words "sell and dispose of," where used in a will with qualification by associated words or other restrictive provisions, will be construed to grant the power to sell only, but where used in a will without qualification by associated words, or other restrictive provisions, the words have been held to extend to barter or exchange as well as to dispose of by sale.

In Phelps v. Harris, 101 U. S. 370, it was said:

"Now, whilst it may be true that, when the words 'disposed of' are used in connection with the word 'sell,' in the phrase 'to sell and dispose of,' they may often be construed to mean a disposal by sale, it does not necessarily follow that when power is given generally, and without qualification by associated words, to dispose of property, leaving the mode of disposition to the discretion of the agent, that the power should not extend to a disposal by barter or exchange, as well as to a disposal of sale. The word is nomen generalissimum, and standing by itself, without qualification, has no technical signification. Taking the whole clause in the codicil together, it is equivalent to an

authority to dispose of the property as the trustee should deem most for the interest of his children; and this would include the power to barter or exchange as well as the power to sell."

In this same case this rule was applied to a trust deed.

In Thurman v. Faith, 69 Ga. 832, in construing a deed executed to minor children which contained the words:

"Provided, that it shall be lawful for the legal guardian of said parties, they being all minors of tender years, to sell and dispose of said lots or parcels of lands, or either of them, whenever, in the discretion of such guardian, the same shall be necessary for the support, maintenance and education of the parties of the second part"

—it was held:

"Under the power contained in the deed above stated, the guardian had authority to exchange the land therein conveyed for other property. Such transaction was, in effect, a sale and receipt of payment in land instead of money."

The words used in the trust agreement seem to us broader than those used in either of the last two cases. It will be observed that not only were the defendants given power to sell and dispose of the Waid property, but there was added, "In the best possible manner."

We hold, then, that the power given included the power to exchange, if in the judgment of the trustees this would be in the best manner possible. See Popp v. Munger, 131 Okla. 282, 268 Pac. 1100. In the absence of bad faith, we think defendants cannot be held liable. We think the trial court was correct in denying a personal judgment against defendants, and also in holding that the remedy of plaintiffs was to follow the trust property even to the North Cincinnati property.

It is contended by plaintiffs that, because Davenport-Bethell Company executed its quitclaim deed to L. S. Cogswell Lumber Company, and thereafter took no active part in handling the property, defendants are liable on that account: We think this proposition is also met by the finding of the court that there was no bad faith on the part of defendants.

It appears that before defendants could make any deal with the property whatever, it was necessary to make certain improvements; that, in order to make these improvements, it was necessary to borrow money. The deal required that the Tacoma property

be mortgaged, and before it could be mortgaged, it likewise had to be improved. The record discloses that defendant Davenport-Bethell Company transferred the title to the property in order that it might be the more readily mortgaged, and there appeared to be no bad faith whatever in the transaction. If there was any bad faith, a different question might be presented.

There being no error, the judgment should be affirmed.

BENNETT, HERR, HALL, and JEFFREY, Commissioners, concur.

By the Court: It is so ordered.