IN THE MATTER OF THE GUARDIANSHIP OF WOOD



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:IN THE MATTER OF THE GUARDIANSHIP OF WOOD

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 IN THE MATTER OF THE GUARDIANSHIP OF WOOD
2019 OK CIV APP 53
Case Number: 116078; Comp w/116349
Decided: 12/31/2018
Mandate Issued: 10/16/2019
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2019 OK CIV APP 53, __ P.3d __

 

IN THE MATTER OF THE GUARDIANSHIP OF HAROLD S. WOOD, A Partially Incapacitated Person.

VIRGINIA L. WOOD, Plaintiff/Appellant,
v.
MARK LYONS, Defendant/Appellee.

APPEAL FROM THE DISTRICT COURT OF
TULSA COUNTY, OKLAHOMA

HONORABLE KURT G. GLASSCO, TRIAL JUDGE

AFFIRMED

Thomas M. Ladner, Roger K. Eldredge, LADNER & ELDREDGE, PLLC, Tulsa, Oklahoma, for Plaintiff/Appellant

Joseph R. Farris, FRANDEN | FARRIS | QUILLIN GOODNIGHT + ROBERTS, Tulsa, Oklahoma, for Defendant/Appellee

JERRY L. GOODMAN, JUDGE:

¶1 Plaintiff Virginia L. Wood (Widow) appeals the trial court's May 2, 2017, order denying her request to impose a surcharge on Defendant Mark Lyons, (Guardian) who had served as a Limited Guardian of Harold S. Wood, a partially incapacitated person, now deceased (Ward). Widow contends that upon his appointment, Guardian was obligated by 30 O.S.2001, § 4-709(A), which defines the appropriate types of investments in which a guardian may invest a ward's money, to liquidate Ward's existing stock portfolio, which was not compliant with § 4-709(A), and use the resulting proceeds to re-invest in § 4-709(A)-approved investments. Widow contends Guardian's failure to do so constituted a breach of fiduciary duty, meriting a surcharge. The trial court found no breach of duty occurred and denied the request for a surcharge. On this first impression issue, based on our review of the facts and applicable law, we affirm the order under review.

BACKGROUND

¶2 Guardian was temporarily appointed Special Limited Guardian of Ward in an order filed July 11, 2007, and was later appointed Limited Guardian, with both the order and letters of limited guardianship being filed August 24, 2007.[1] At the time of Guardian's appointment, Ward was 84, in poor health, and required round-the-clock professional medical care. He lived with Widow and his medical staff, and owned substantial assets. Guardian had been Ward's attorney for at least 10 years prior to his appointment as Ward's guardian. Guardian managed Ward's and Widow's assets until Ward's death on January 7, 2012. After Guardian filed a final account of Ward's estate on October 12, 2012,[2] Widow objected to that accounting on October 29, 2012. She requested Guardian be made subject to a surcharge for allegedly breaching his fiduciary duties relating to the handling of Ward's assets, and for failure to timely file required reports.3, [4] Widow claimed that Guardian caused a financial loss to Ward by failing to immediately liquidate Ward's existing, substantial stock portfolio which contained volatile, individual blue-chip stocks, and convert that portfolio into one consisting of the approved bond funds set out in 30 O.S.2001, § 4-709(A). Widow also sought an order discharging Guardian as Limited Guardian, and that he be denied a fee for his services.

¶3 Guardian filed a motion for summary judgment on April 25, 2014.[5] He argued § 4-709(A) did not require him to liquidate the stock portfolio, and objected to being discharged as Guardian. In a minute order filed August 6, 2014, the court, without comment, granted Guardian's summary judgment on the issue of § 4-709(A), but removed Guardian as Limited Guardian, at Widow's request.6, [7] Guardian's letters of guardianship were revoked, but Guardian was not discharged immediately, and instead ordered to submit a final accounting before September 11, 2014.[8] Substitute guardians for Widow were appointed, as well as a substitute personal representative for Ward's estate.

¶4 The surcharge and breach of fiduciary duty issues between the parties continued until an evidentiary hearing was held over several days in November, 2016. On May 2, 2017, the trial court filed an order containing extensive and detailed findings of fact and conclusions of law.[9] The trial court denied Widow's motion to surcharge Guardian, finding that he met the standard of care in his handling of Ward's assets and breached no fiduciary duties.[10] Widow appeals this order.

STANDARD OF REVIEW

¶5 In re Estate of LaRose, 2000 OK CIV APP 33, ¶ 5, 1 P.3d 1018, 1021, states:

Where a final account of a guardian is presented and considered and surcharges made and disallowed, and thereafter an appeal is taken, the matter will be considered as an appeal from an equity judgment and the surcharges made or disallowed will be approved where such action is based on competent evidence and not clearly against the weight of the evidence. In re Guardianship of Durnell, 1967 OK 62, 434 P.2d 905. The judgment of the trial court in a settlement of a guardian's account will not be disturbed unless against the weight of the evidence. Pruitt v. Pilgreen, 178 Okl. 608, 64 P.2d 263 (1936).

ANALYSIS

¶6 The central issue in this case is a dispute between Widow and Guardian over Guardian's management of Ward's substantial stock portfolio. Widow's brief-in-chief alleges the trial court committed errors of law and erred in its interpretation and application of certain undisputed facts to the law. With certain limited exceptions, Widow does not allege the trial court's findings of fact are erroneous; rather, she argues those facts support a different conclusion than that made by the trial court, resulting in trial court error. Therefore, after determining if they are supported by competent evidence, we will cite the applicable findings of fact in addressing each issue on appeal.

I. Was Guardian Required to Liquidate Ward's Stock Portfolio by Operation of 30 O.S.2001, § 4-709(A)?

¶7 Widow presents a first impression question of law. Questions of law mandate application of the de novo standard of review, which affords this Court with plenary, independent, and non-deferential authority to examine the issues presented. Martin v. Aramark Servs., Inc., 2004 OK 38, ¶ 4, 92 P.3d 96, 97; Kluver v. Weatherford Hosp. Auth., 1993 OK 85, ¶ 14, 859 P.2d 1081, 1084.

¶8 The resolution of this issue requires the interpretation of the statute in effect when Guardian was first appointed as a limited guardian, i.e., 30 O.S.2001, § 4-709.[11]

A. Except as may be otherwise provided by law, the money belonging to estates of minors and incapacitated or partially incapacitated persons, subject to the jurisdiction of the court, can only be invested in one or more of the following:

1. Real estate and first mortgages upon real property which do not exceed fifty percent (50%) of the actual value of the property;

2. United States bonds, or any other type of security certificate, or evidence of indebtedness which is guaranteed by the United States government, or any authorized agency thereof;

3. State bonds;

4. Bonds of municipal corporations;

5. Annuities covered by the Oklahoma Life and Health Insurance Guaranty Association, which do not exceed Three Hundred Thousand Dollars ($300,000.00), individually; or

6. Accounts in savings and loan associations and credit unions located in this state, and all types of interest-bearing time deposits and certificates of banks, savings and loan associations, and credit unions located in this state, not to exceed the amount insured by the United States government.

Section § 4-709(A) (emphasis added).[12]

¶9 At the time of Guardian's appointment as a limited guardian, the trial court found:

23. In August 2007, [Ward's] Smith Barney stock portfolio had a gross value of a little over $6 million with a margin debt of $2,170,000. The net value of the account as of August 31, 2007, was $3,924,939.74.

24. The account was made up of 100% equities/stocks. There were no fixed-income assets, no CDs, and no T-bills. The portfolio was weighted in energy stocks.

25. [Ward] had chosen the nature of his stock portfolio being weighted 37% to energy stocks over a period of 52 years.[13]

It is undisputed that Ward's portfolio did not consist of any of the six investment categories set out in § 4-709(A).

¶10 Widow contends that upon Guardian's appointment, he was obligated by
§ 4-709(A) to immediately liquidate the Smith Barney stock portfolio in order to rid it of non-§ 4-709(A)-sanctioned investments, and use the proceeds of that sale to purchase a portfolio that complied with § 4-709(A)'s list of approved investments. In support of this argument, Widow cited Freeman v. Prudential Sec., Inc., 1993 OK CIV APP 65, 856 P.2d 592, for its proposition that "Guardians ... were limited in the investments they could make for their wards, pursuant to ... § 4--709." Id. at ¶ 10, at 594.[14] Widow argues that by not reconfiguring the volatile, stock-heavy portfolio into the statutorily-authorized, relatively stable, investments, Ward suffered unnecessary and preventable losses during the 2007-2008 stock market turmoil that soon followed.[15] Widow contends Guardian should bear responsibility for those losses and be surcharged.

¶11 Guardian contended he was under no obligation to liquidate an existing stock portfolio and reinvest the proceeds to conform to § 4-709's guides. Instead, he argued he was only obligated to follow § 4-709 if he possessed money belonging to Ward which he intended to use to purchase future investments on Ward's behalf. Guardian argued that to immediately liquidate the holdings would have subjected Ward's estate to further losses. Moreover, selling the "blue-chip" stocks during a time in which their values were already temporarily depressed would result in enormous capital gains taxes. This would have significantly depleted the amount of money available for Ward's future use and care.[16]

¶12 The trial court found that, under these facts, § 4-709(A) did not require liquidation. We agree.

A. Analysis of § 4-709(A)

¶13 Section 4-709(A) states:

Except as may be otherwise provided by law, the money belonging to estates of ... incapacitated or partially incapacitated persons, subject to the jurisdiction of the court, can only be invested in one or more of the following [six categories of investments]... ." (Emphasis added).

¶14 The issue, as framed by the parties, turns on the definition of "money." Widow contends the term "money," as used in § 4-709(A), includes Ward's stock holdings. She contends this section applies whether "the Ward's approximately $4 million is initially held in cash under the Ward's bed, deposited in the Ward's checking account, or invested in the Ward's stock account."[17] Widow argues that the "term 'money' is not limited to just 'cash' or 'currency' but also includes 'gold and silver coin, treasury notes, bank notes and other forms of currency in common use'" which an owner could "withdraw in money on demand" citing Mason v. State, 1923 OK CR 62, ¶ 18, 212 P. 1028, 2030.[18] Thus, upon his appointment, Guardian was required to conform Ward's money, no matter the form, and whether cash or stock certificate notwithstanding, into a § 4-709(A)-acceptable investment.

¶15 Guardian contends "money" is not the same as "stock." Therefore, unless Guardian chose to use Ward's money to invest in new holdings, § 4-709(A) does not apply. Further, §4-709(A) does not compel liquidation of existing stock holdings. Finally, Guardian argues § 4-709(A) does not mandate investment of Ward's money, but merely permits its optional investment, though in a prescribed way.[19]

¶16 Our analysis must begin with established definitions of the terms used in the statute. Unless specially defined, we use the terms in their most common form.

In the absence of a contrary definition of the common words used in the act, we must assume that the lawmaking authority intended for them to have the same meaning as that attributed to them in ordinary and usual parlance.

Riffe Petroleum Co. v. Great Nat. Corp., Inc., 1980 OK 112, ¶ 7, 614 P.2d 576, 579 (footnote omitted). Further,

In Applications of Oklahoma Turnpike Authority, Okl., 277 P.2d 176, 182, we said:

'The general rule is that all legislative enactments must be interpreted in accordance with their plain ordinary meaning according to the import of the language used. See Loeffler v. Federal Supply Company, 187 Okl. 373, 102 P.2d 862.' See also City of Duncan ex rel. Board of Trustees of Police Pension and Retirement System v. Barnes, Okl., 293 P.2d 590.

W. S. Dickey Clay Mfg. Co. v. Ferguson Inv. Co., 1963 OK 298, ¶ 19, 388 P.2d 300, 304. Finally,

To ascertain intent, the Court looks to the language of the pertinent statute(s) and presumes the legislative body intends what it expresses. Where a statute's language is plain and unambiguous, and the meaning clear and unmistakable, no justification exists for the use of interpretative devices to fabricate a different meaning. Terms in a statute are given their plain and ordinary meaning, except when a contrary intention plainly appears, and the words of a statute should generally be assumed to be used by the law-making body as having the same meaning as that attributed in ordinary and usual parlance. Neer v. Oklahoma Tax Comm'n, 1999 OK 41, ¶¶ 15--16, 982 P.2d 1071, 1078.

First United Bank & Tr. Co. v. Wiley, 2008 OK CIV APP 39, ¶ 13, 183 P.3d 1022, 1026--27.

¶17 Section 4-709(A) is part of the Oklahoma Guardianship and Conservatorship Act, 30 O.S.2011 and Supp. 2017, §§ 1-101 through 6-102 (OGCA). We begin there for definitions.

¶18 Generally, the OGCA defines the terms "Manage financial resources" or "manage the estate" as "those actions necessary to obtain, administer, and dispose of real property, business property, benefits and income, and to otherwise manage personal financial or business affairs." Id. at § 1-111(A)(17).

¶19 The OGCA defines "intangible personal property" as "cash, stocks and bonds, mutual funds, money market accounts, certificates of deposit, insurance contracts, commodity accounts, and other assets of a similar nature." Id. at § 1-111(A)(14). Clearly, Ward's portfolio is within this definition.

¶20 However, though the OGCA includes the terms "cash, stocks and bonds" within the definition of "intangible personal property," the terms "Money" or "Investment" are not defined in the OGCA. We therefore look elsewhere for definitions.

¶21 "Money" is defined in Oklahoma's Uniform Commercial Code as:

"Money" means a medium of exchange authorized or adopted by a domestic or foreign government. The term includes a monetary unit of account established by an intergovernmental organization or by agreement between two or more countries.

12A O.S.2011, § 1-201(b)(24).

¶22 Black's Law Dictionary defines "money" as:

In usual and ordinary acceptation it means coins and paper currency used as circulating medium of exchange, and does not embrace notes, bonds, evidences of debt, or other personal or real estate. . . .

Black's Law Dictionary 906 (5th ed. 1979). Black's defines "investment" as:

An expenditure to acquire property or other assets in order to produce revenue; the asset so acquired. The placing of capital or laying out of money in a way intended to secure income or profit from its employment. . . . To purchase securities of a more or less permanent nature, or to place money or property in business venture or real estate, or otherwise lay it out, so that it may produce a revenue or income.

Black's Law Dictionary 741 (5th ed. 1979) (emphasis added). Oklahoma case law provides further guidance:

The word "invest" is defined by 33 C. J. p. 807, as follows:

Invest--to convert into some other form of wealth usually of more or less permanent nature; to employ for some profitable use; to place so that it will be safe and yield a profit; to surround with or place in.

In the case of La Belle Iron Works v. U. S., 256 U. S. 377, 41 S. Ct. 528, 65 L. Ed. 998, the court says:

* * * 'to invest' imports a laying out of money, or money's worth, either by an individual in acquiring an interest in the concern with a view to obtaining income or profit from the conduct of its business, or by the concern itself in acquiring something of permanent use in the business; in either case involving a conversion of wealth from one form into another suitable for employment in the making of the hoped-for gains.

Popp v. Munger, 1928 OK 277, ¶¶ 18, 19, 268 P. 1100, 1103.

¶23 It is clear from a reading of Oklahoma case law, Oklahoma statutes, and of general definitions, that the terms "money" and "investment" are neither synonymous nor interchangeable. Money is used to obtain an investment in an enterprise in the hope the investment will in time return money to the investment owner. Widow's argument that the two terms are the same is therefore rejected.[20]

¶24 We hold that § 4-709(A) regulates only the use of a ward's money held by a guardian that is intended to be invested on behalf of the ward. It does not directly address a ward's existing investment portfolio which may consist of stocks, bonds, or other investment vehicles that are not encompassed in § 4-709(A)'s approved investments. Nor does it require a guardian who is managing an existing portfolio that is non-compliant with § 4-709(A) to liquidate or otherwise convert that preexisting portfolio into a compliant investment.[21] Such language appears nowhere in the statute, and this Court will not add language to a statute that the Legislature itself has not chosen to use.

When the language of the statute is plain, it will be followed without further inquiry. When further inquiry is needed, this court is "not free to rewrite the statute.... [T]he sole function of the courts--at least where the disposition [called for] by the text is not absurd--is to enforce it [the statute] according to its terms." Courts must "if possible, construe a statute to give every word some operative effect" and vigorously "resist reading words or elements into a statute that do not appear on its face". The legislature expresses its purpose by words. "It is for [this court] to ascertain [the meaning of these words]--neither to add nor to subtract, neither to delete nor to distort." This court is thus without authority to supplement by judicial interpretation the classification of persons subject to statutory authority "but must accord the language used by the Legislature, it being unambiguous, ... fair, reasonable, plain and ordinary import or meaning."

Oklahoma City Zoological Tr. v. State ex rel. Pub. Employees Relations Bd., 2007 OK 21, ¶ 6, 158 P.3d 461, 464 (footnotes omitted).

¶25 The trial court correctly decided this issue of law and its decision that Guardian was not required to liquidate the existing stock portfolio was correct and is affirmed.

B. Other Reasons Support our Analysis

¶26 Widow points to no Oklahoma case law, nor indeed to any precedential authority, in support of her argument. We reject both Mason, infra,[22] and Freeman, infra[23] as inapplicable to these facts. However, one of the cases Widow cites for authority is instructive.

¶27 Widow cites In re Seamans' Estate, 5 A.2d 208 (Penn. 1939), a Pennsylvania Supreme Court case written in the aftermath of the Great Depression, as authority for the proposition that: "a guardian must promptly dispose of the ward's investments that are outside the scope of the investments permitted by the guardianship statutes,"[24] and that the "safe, proper, and only recourse for appellant was thereupon to convert the estate into authorized investments." Seamans' Estate, id. at 212. Though having already found that under these facts, Oklahoma's guardianship statutes do not compel liquidation of a ward's existing investments, and therefore Seamans' Estate's holding is rejected, the case is, nevertheless, instructive to our analysis.

¶28 Mr. Seaman died in 1929 owning a number of common stocks of various local mining companies, national railroads, regional and national banks, and major companies such as General Electric and United States Steel Corporation. This portfolio was distributed to his four minor children and was managed by a guardian. When the oldest child came of age, he sued the guardian, alleging the guardian unnecessarily held onto the stocks instead of liquidating them during the so-called Great Depression. The former ward sought to surcharge the guardian for the lost value of those depreciated stocks.

¶29 Of interest to our analysis is the Pennsylvania court's discussion regarding the tension between selling a stock portfolio and retaining it intact during turbulent financial times:

If a fiduciary receives nonlegal securities as part of the trust estate, he is vested by law with a measure of discretion and allowed to some extent to exercise his own judgment as to the wisdom of selling the securities under prevailing market conditions. However, in the absence of exceptional circumstances, he should convert them promptly. This does not require that he sell them immediately, as 'under the whip of the law,' but it means that he should not continue to hold them indefinitely merely because he believes that they will appreciate in value and would therefore retain them if they were his own securities.

Under certain circumstances a fiduciary is excused from the prompt sale of nonlegal securities which is otherwise required. Such circumstances cannot be completely catalogued; they must be considered in each case as they arise. Among them may be ... instances ... where a security is abnormally depressed in value because of a general economic and financial collapse, so that a sale can be effected only at a sacrifice, but there is a reasonable likelihood of an early return to stable conditions which will restore the normal value. A fiduciary is not compelled to jettison seasoned investments during a temporary panic. ...

Id. at 211--12 (emphasis added). Although the Pennsylvania court upheld the imposition of a surcharge under the facts of that case, the dissent stated:

I would make no surcharge. We are here dealing with a situation which might well confound any man. The guardian received the securities when the financial walls were falling. He did not make the investments himself. He did what, it seems to me, was the most prudent thing he could do, sought the aid and advice of one of the principal financial institutions of the community in which he lived to help him solve the problem with which he was confronted, whether to sell the securities at what seemed terrible sacrifices or to hole them. ... No prudent person, unless compelled to do so, would have sold these securities at the distress figures of 1931.

I think the case should be viewed, not retrospectively, but from the position in which the guardian found himself in the upset financial world, and so viewed, I cannot say he did not exercise 'normally good judgment' and common skill, common prudence and common caution.

Id. at 213 (emphasis added).

¶30 In our case, the trial court's findings of fact reflect a very similar dilemma faced by Guardian.

36. The stock in [Ward's] portfolio had been accumulated over approximately 50 years. ... [Guardian] took into account through discussions with various brokers, that an immediate sale of the stock prior to [Ward's] death would have resulted in a tax liability of approximately $2.7 to $3 million which would have significantly reduced the estate. [Ward] was 85 years old and in poor health. If [Guardian] had sold off the entire stock portfolio and paid down the margin loan immediately, there would have been a 30-35% tax on the sale of the entire stock. With roughly $20,000/month living expenses needed, the account would have been depleted to under $1 million in a year or two.

37. Based on these considerations, [Guardian] did not think it was prudent to liquidate the entire account just to pay off the margin loan.

...

39. In memos to his file from February 2008 and May 2009, [Guardian] analyzed the downturn in the market which affected the value of the account at the time. In 2009, [Guardian] was also still dealing with the tax penalty and interest issues incurred because the [Ward and Widow] had not filed three years of tax returns before [Guardian] was appointed Limited Guardian. [Guardian] did not know the full extent of that liability and he needed to retain stock to make those payments, if necessary. Given the blue chip status of the stocks, [Guardian] never believed that [Ward's] account would have been wiped out. The speculation by [Widow] that it could have been wiped out is not supported, because in fact the account made millions of dollars later.

40. [Guardian] did not sell when the stock market was down believing that it is the worst time to sell. He also did not sell in the Fall of 2007 because the market was climbing and continued to go up another couple of thousand points.

¶31 We find no error in the trial court's reasoning or its application of fact to the law.

¶32 Finally, Guardian's choice not to immediately liquidate the stock portfolio must be considered in light of his duty as a guardian to a ward, as set out in 30 O.S. 2011, § 1-121:

A. A guardian of the property must keep safely the property of his ward. ...

B. A guardian of the property, in relation to powers conferred pursuant to the provisions of the Oklahoma Guardianship and Conservatorship Act, shall act as a fiduciary and shall perform, diligently and in good faith, as a prudent person would in managing his own property, not with regard to speculation but with regard to conservation and growth, and the specific duties and powers assigned by the court.

¶33 Our Court has held:

"The whole theory of guardianships is to protect the ward during his period of incapacity to protect himself." Oyama v. California, 332 U.S. 633, 643-44, 68 S.Ct. 269, 274, 92 L.Ed. 249 (1948). ... A guardian must keep his or her ward's property safe. 30 O.S.2011 1-121(A).

Tinker Fed. Credit Union v. Grant, 2017 OK CIV APP 9, ¶ 24, 391 P.3d 766, 771. Under these facts, Guardian was charged with the duty to prudently manage Ward's property, not to actively speculate with his stock portfolio. Given the unforeseeable financial circumstances described above, we cannot say Guardian's handling of Ward's portfolio was a breach of his fiduciary duty or of law.

¶34 Finally, recent amendments to this statute support our analysis. Section 4-709 was amended, effective November 1, 2017. Though Guardian was not bound by these amendments, having been removed as guardian before their effective date, we are permitted to review subsequent legislative amendments in order to better understand the intent of the act.

It is well settled that subsequent amendments to an act can be used to ascertain the meaning of the prior statute. See Texas County Irrigation & Water Resources Ass'n v. Oklahoma Water Resources Bd., 803 P.2d 1119, 1122 (Okla. 1990). See also Board of Educ. v. Morris, 656 P.2d 258, 261 (Okla. 1982); Magnolia Pipe Line Co. v. Oklahoma Tax Comm'n, 196 Okla. 633, 167 P.2d 884, 888 (1946). Where the meaning of a prior statute is subject to serious doubt and has not been judicially determined, a presumption arises that a subsequent amendment was meant to clarify, as opposed to change, the prior statute. Texas County, 803 P.2d at 1122; Magnolia Pipe Line, 167 P.2d at 888. A subsequent statute clarifying a prior statute can be used to determine the meaning of the prior statute even if the interpretation affects alleged vested rights. See, e.g., Morris, 656 P.2d at 261.

Quail Creek Golf v. Okl. Tax Comm., 1996 OK 35, ¶ 10, 913 P.2d 302, 304. The relevant amendments state:

B. When an individual guardian is investing the money belonging to estates of minors or incapacitated or partially incapacitated persons, subsection A of this section shall not apply, provided that the guardian has contracted with a person who is a registered investment advisor representative pursuant to the Oklahoma Uniform Securities Act of 20041 and a certified Financial Planner credentialed by the Certified Financial Planner Board of Standards, and provided further that the court authorizes such investments.

...

D. When an individual guardian enters into an agreement with a bank or trust company, or when the guardian is a bank or trust company qualified and acting under the supervision of the Banking Board, or of the Comptroller of the Currency of the United States of America, the guardian may, upon application to the court, invest funds coming into its hands as guardian in any property, real, personal or mixed, in which an individual may invest the individual's own funds pursuant to the provisions of the Oklahoma Uniform Prudent Investor Act, unless otherwise provided by law.

30 O.S.2011 and Supp. 2017, § 4-709.

¶35 These recent amendments recognize the need to provide other investment opportunities than those enumerated in § 4-709(A)'s original, rather limited choices. The amendment is an effort to require a guardian to obtain expert financial oversight, or a second set of eyes, on a ward's future portfolio. The amendment encourages a guardian to convert "funds coming into its hands as guardian" in "any" investment, as long as such investment would be sanctioned by the Prudent Investor Act. What the amendment does not do is require an existing portfolio be liquidated, taxed, and reinvested. It is limited to the "money" or "funds coming into [a guardian's] hands." Id. at § 4-709(D). The record shows that Guardian did indeed consult with various financial experts and planners before making his decision as to how best manage Ward's existing portfolio during very volatile financial times. Some of those experts advocated Widow's position: i.e., selling the stock and paying off the margin loan immediately. In retrospect, Guardian's choices proved more sound than those of the experts he consulted. However, even were that not the case, Guardian's choices, based as they were on the information available to him at that time, were not in violation of either law or his fiduciary duties.

II. Excusing Admitted Breach of Reporting Deadlines

¶36 Widow next argues the trial court's order should be reversed because the trial court erred when it "excused" Guardian's admitted breaches of statutory duty to file timely guardianship reports. Guardian had a duty to file an inventory of the estate within two months of his appointment, unless extended by the court,[25] had a duty to file a guardianship report annually,[26] had a duty to file a report within two months after the death of the ward,[27] and to file a report upon his removal as guardian.[28] Widow contends Guardian breached these statutory duties, thus constituting a breach of his fiduciary duties. When the trial court failed to assess a surcharge for those breaches, it erred, argues Widow.

¶37 In this regard, the trial court's undisputed findings of fact state:

51. [Guardian] admitted he was late in filing the annual reports in 2008 and 2009 and the final accounting. He nevertheless eventually filed those reports and accountings and such reports and accountings were accepted by the Court. The Court approved his 2010 and 2011 filings. No claim has been made that the filings did not accurately report and account for all income and expense in the [Ward's] Estate.

52. [Guardian] did not follow statutory or local court rules in submitting annual accounting or plans for the care and treatment of the property of the ward. He failed, refused or neglected to follow the formalities required by law or rule.

53. Although [Guardian] never filed a complete inventory of [Ward's] estate with the Court, he had a complete inventory available for review by [Widow's] attorneys or [Widow]. [Guardian] prepared a financial report and an inventory but neither were filed with the court in [Ward's] guardianship. He did file a partial inventory of oil and gas interests in [Ward's] Guardianship, which was accepted by Judge Dreiling, and he filed an inventory in [Widow's] Guardianship.

54. Although [Guardian] never filed a complete management plan approved by the court, he documented his thought processes by way of contemporaneous memos throughout the course of his Limited Guardianship to show his reasoning and to be as thorough as possible. He also filed the request to sell $1.8 million in stock to pay off the margin loan, which was the equivalent of a management plan. He discussed that plan with Judge Dreiling so the Judge would know what he was doing even though he believed he had authority to make those kinds of sales without a specific court order. He also sought court approval before dealing with oil and gas properties. ... In fact, he filed two motions to sell off stock for which he obtained court approval.

¶38 Widow contends the trial court erred when it:

gave this Tulsa lawyer a pass refusing to enter a finding that [Guardian]'s clear statutory violations constituted a breach of fiduciary duty. Given the unequivocal command of the statutes, the district court's ruling is clearly erroneous and represents an abuse of discretion.[29]

¶39 Title 30 O.S.2011, § 4-901(A) states:

Any guardian who willfully violates the duties or willfully misuses the powers assigned by the court and thereby causes injury to the ward or damages to the financial resources of the ward shall, in addition to any criminal penalties, be liable in a civil action for any actual damages suffered by the ward. Nothing in this subsection shall limit the authority of the court to surcharge a guardian as otherwise provided by law.

¶40 The record supports the trial court's finding that Guardian missed many mandatory filing deadlines, a fact which Guardian admits. The trial court also found that those late reports were accepted by a supervising court, which had the effect of either extending the deadline to file, or waiving the deadline, at the court's discretion. Significantly, however, the trial court found no harm to the Guardianship Estate resulted from the missed deadlines.

55. As of the date of trial, no one had identified any asset of either [Ward or Widow] that they claim was omitted from [Guardian]'s management of the estate. No one has accused [Guardian] of missing any deposit, payment, or any other omission of a material or financial nature during his tenure as Limited Guardian.[30]

¶41 Widow admits this, according to the trial court:

3. [Widow] stipulated she had no claims of malfeasance against [Guardian]. He was not accused of mishandling the Estate, taxes, debts, obligations, or personal wellbeing of the [Ward and Widow].[31]

¶42 Although Widow had established Guardian violated the statutory deadlines to file those reports, in order to subject Guardian to liability for violating the duty to timely file a report, it must be shown that such breach "thereby causes injury to the ward or damages to the financial resources of the ward... ." § 4-901(A). The trial court found no such damages occurred. Widow admits this. Therefore, we find the trial court's findings in this regard were not erroneous.

III. Failure to Repay Margin Loan

¶43 Widow next contends Guardian breached his fiduciary duty to Ward to prudently manage Ward's assets when Guardian failed to immediately pay off the margin loan in the Smith Barney account. This issue was encompassed within the earlier, broader issue regarding whether Guardian was required to liquidate the account, which would necessarily require repaying the margin loan. Because we found no error in the trial court's resolution of that issue, we accordingly find no error here.

IV. Omissions in Findings of Fact

¶44 Widow correctly contends the trial court failed to include in its findings of fact certain unrebutted evidence regarding the amount of interest Ward paid on the unrepaid margin loan. She claims error. While Widow's claim that the trial court's findings of fact omit the specific items complained of is accurate, we find no reversible error occurred. Our Courts have addressed this issue.

¶45 In Thomas v. Owens, 1952 OK 64, 241 P.2d 1114, the Court held:

A party is not entitled to a specific finding of fact, or conclusion of law, upon every point which he may request. Kilgore v. Stephens, 159 Okl. 119, 14 P.2d 690. A trial court is not required to make specific findings of fact and conclusions of law in the form as submitted and requested by a party, but is merely required to state its findings of the material and controlling facts, separately from the conclusions of law. Bradford v. Mayes Mercantile Company, 89 Okl. 31, 213 P. 743. If a court makes findings of fact and conclusions of law on the vital issues, sufficient to serve as a basis for the judgment rendered, a contention that the court refused to make findings of fact and conclusions of law, or a contention that the court refused to make adequate findings of fact and conclusions of law, is without merit. Black, Sivalls & Bryson v. Farrell, 131 Okl. 249, 268 P. 276.

Thomas v. Owens, 1952 OK 64, ¶ 9, 241 P.2d 1114, 1118. See also, Littlefield v. Roberts, 1968 OK 180, ¶ 10, 448 P.2d 851, 854.

¶46 Finally, even though Widow submitted unrebutted evidence in support of her theory of recovery, "the trial judge, who observes the demeanor of the witnesses ... is the sole arbiter of the credibility of the witnesses and the weight to be given to their testimony." Peabody Galion Corp. v. Workman, 1982 OK 42, ¶ 13, 643 P.2d 312, 315. "Thus, the fact finder may choose to believe some evidence and reject other evidence which in its opinion lacks veracity." Moore v. Mustang Pub. Sch., 2006 OK CIV APP 67, ¶ 4, 136 P.3d 737, 738.

Likewise, the credibility of witnesses and the effect and weight to be given to their testimony are questions of fact to be determined by the trier of fact ... and are not questions of law for the Supreme Court on appeal. Hagen v. Independent School District No. I--004, 2007 OK 19, ¶ 8, 157 P.3d 738, 740.

Manufacturers Guild, Inc. v. City of Enid, 2010 OK CIV APP 87, ¶ 6, 239 P.3d 986, 988--89.

¶47 Disregarding for the moment the trial court's finding that no breach of duty occurred and therefore no damages are owed, we find the omission of findings of damage in the trial court's findings of fact does not constitute reversible error. We find the trial court made "findings of fact and conclusions of law passing correctly upon vital issues sufficient to become the predicate of the judgment rendered, [therefore] a contention by the party making the request that the court refused to make such findings and conclusions is without merit." Black, Sivalls & Bryson v. Farrell, 1928 OK 269, ¶ 0(3), 268 P. 276, 276.

V. Measuring Damages--Wrong Date

¶48 Finally, Widow asserts the trial court erred when it used the wrong date to measure the damages she claimed were due. This argument assumes damages were awarded. As set out above, this Court has affirmed the trial court's decision that no breach of duty occurred, and therefore, no damages are warranted. It stands to reason, therefore, that an alleged error regarding the length of time over which non-existent damages should be measured is without merit.

CONCLUSION

¶49 Having examined the voluminous record and examined the applicable law, we find no reversible error occurred. The trial court's May 2, 2017, order is affirmed.

¶50 AFFIRMED.

BARNES, P.J., and RAPP, J., concur.

FOOTNOTES

[1] Guardian was also appointed the Special Limited Guardian of Widow on July 10, 2007. See, Findings of Fact and Conclusions of Law (FFCL), R. 2807, ¶ 4.

[2] R. 490.

[3] R. 659.

[4] The record strongly suggests Widow's dissatisfaction with Guardian was prompted by Widow's grandson. Prior to Guardian's appointment, Ward and Widow subsidized grandson's lifestyle, including paying for his tuition, apartment, utilities, cell phone, and other expenses while attending an out-of-state college (R. 487). After his appointment, Guardian began limiting those expenses, which displeased grandson (R. 483), to the point grandson filed a motion to compel Guardian to pay grandson's expenses from Ward's estate (R. 482). Grandson exerted great influence over Widow, initiated contact with attorneys in his effort to have Guardian removed, and later filed a bar complaint against Guardian because of Guardian's refusal to use Ward's and Widow's funds to buy a car wash business for grandson, pay for a ski trip, college funds, or country club dues. Grandson is likely a primary beneficiary of Ward's and Widow's estates.

[5] R. 879.

[6] See, n. 1.

[7] See, n. 4.

[8] R. 2135.

[9] R. 2806-2825.

[10] On May 22, 2017, the trial court granted Guardian a fee. In its remarks, the trial court stated the objection to Guardian's stewardship was "being driven by the grandson and not Mrs. Wood." (Transcript May 22, 2017, p. 2 ll 18-19); that Guardian "did a very good job representing the Woods" (id. l. 24), and that Guardian "went above and beyond what would be expected ... ." (id. p. 3, l.1-2).

[11] This subsection was subsequently amended effective November 1, 2011. See, 30 O.S.2001 and Supp.2017, § 4-709. These amendments are discussed elsewhere in this opinion.

[12] Though this issue was earlier decided in Guardian's favor after being raised in Guardian's April 2014, motion for summary judgment, the issue may again be properly raised at this hearing.

Moreover, since any interlocutory summary adjudication is subject to alteration or modification by the trial court before entry of final judgment determining all the issues raised by a claim, it can have no binding res judicata effect. By issuing an order of this kind, the trial court does not relinquish, but rather retains, full power to make one complete adjudication of all facets of the action when the case comes to be concluded.

Reams v. Tulsa Cable Television, Inc., 1979 OK 171, ¶ 6, 604 P.2d 373, 376 (footnotes omitted).

[13] R. 2809-2810.

[14] We address Freeman elsewhere in this opinion.

[15] This time of economic turmoil became variously known as the Financial Crisis of 2007-2008, or the Great Recession of 2008-2009, in which the U.S. stock market, as measured by the Dow Jones Industrial Average, lost more than 50 percent of its value, or $11 trillion, moving from over 14,100 in October 2007, down to 6,400 points by March 2009. The Dow did not return to its 2008 levels until March 2013.

[16] Guardian argues that Ward's investment portfolio had a cost basis of $550,000.00 on a portfolio valued in excess of $6,000,000.00, which, if liquidated within a short time of his appointment, would subject Ward to a large tax liability of between $2-3,000,000.00. This would have left considerably less money available to re-invest in §4-709-approved investments.

[17] Brief-in-Chief, p. 16.

[18] We discuss Mason's application later in this opinion.

[19] We interpret § 4-709(A)'s use of the phrase "can only be invested" as a permissive, not compulsory, use of a ward's money. In other words, Widow's position is that any money in a guardian's hands must be invested in a § 4-709(A) portfolio. We disagree, holding that any money in a guardian's hands, that guardian chooses to invest, "can only be invested" pursuant to § 4-709(A).

[20] If Widow was correct, and "money" and "stocks" were one and the same, there would be no need to invest the money into stocks because, by that logic, they are the same. Likewise, there would be no need to compel Guardian to liquidate Ward's stocks into money, as again, they are the same. This reasoning leads to an absurdity. We cannot interpret a statute in such a way as to lead to an absurdity. ("Finally, statutory construction that would lead to an absurdity must be avoided and a rational construction should be given to a statute if the language fairly permits." Ledbetter v. Oklahoma Alcoholic Beverage Laws Enf't Comm'n, 1988 OK 117, ¶ 7, 764 P.2d 172, 179.)

[21] Though a guardian, acting in the best interest of the Ward, may choose to do so.

[22] Widow cites Mason for the proposition that the term "money" includes "gold and silver coin, treasury notes, bank notes and other forms of currency in common use," and by extension, Ward's stocks and bonds. Widow misapplies this case. The defendant in Mason fraudulently billed the City of Ardmore for services the City had already paid, causing it to issue him a city warrant, which he deposited into his personal account and made withdrawals. He was charged with fraudulently obtaining money. Mason claimed that falsely obtaining a warrant was not the same as falsely obtaining cash, and challenged his conviction. The Oklahoma Criminal Court of Appeals rejected this argument and held that for purposes of the fraud charge, "money" could "include coin, currency, drafts, warrants, and other things equivalent to money ..." Mason v. State, 1923 Okla. Crim. 111, ¶ ___, 212 P. 1028, 1031 (1923). Mason does not address stocks, bonds, investments, or securities. It limited its definition of "money" to those items which could be deposited or credited in a bank account for later withdrawal. Clearly, a stock certificate cannot be deposited in a bank account. We therefore reject Widow's application of Mason to this case.

[23] Freeman, 1993 OK CIV APP 85, 856 P.2d 592, is inapplicable to the facts of this case. A conservator purchased certain Prudential securities on behalf of the ward that contractually compelled arbitration under New York law in the event of a dispute. A second guardian was appointed and filed suit in Oklahoma, contending the sale of the securities was procured by fraud and in violation of Oklahoma's Securities Act. When Prudential sought to compel arbitration in New York, the Freeman Court held the original conservator had no authority under the previous version of § 4--709 then in effect to enter into a contract for those unauthorized securities, and therefore the arbitration clause was unenforceable. Id. at ¶ 11, at 595. Freeman stands for the single proposition that a guardian is limited to purchasing only the investments specified in the statute. That proposition is not in dispute; however, it is not the issue in this case.

[24] Brief-in-Chief, p. 14

[25] Title 30 O.S.2011, § 4-301.

[26] Title 30 O.S.2011, § 4-303.

[27] Title 30 O.S.2011, § 4-803.

[28] Title 30 O.S.2011, § 4-803.

[29] Brief in Chief, December 6, 2017, p. 11.

[30] R. 2815-2816.

[31] R. 2807.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1923 OK CR 62, 212 P. 1028, 23 Okl.Cr. 111, Mason v State
Discussed at Length
Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 1993 OK CIV APP 65, 856 P.2d 592, 64 OBJ 2522, Freeman v. Prudential Securities, Inc.
Discussed at Length
 1993 OK CIV APP 85, 854 P.2d 388, 64 OBJ 1878, Tuttle & Associates, Inc. v. Scoufos
Cited
 2006 OK CIV APP 67, 136 P.3d 737, MOORE v. MUSTANG PUBLIC SCHOOLS
Discussed
 2008 OK CIV APP 39, 183 P.3d 1022, FIRST UNITED BANK AND TRUST CO. v. WILEY
Discussed
 2010 OK CIV APP 87, 239 P.3d 986, MANUFACTURERS GUILD, INC. v. CITY OF ENID
Discussed
 2017 OK CIV APP 9, 391 P.3d 766, TINKER FEDERAL CREDIT UNION v. GRANT
Discussed
 2000 OK CIV APP 33, 1 P.3d 1018, 71 OBJ 1250, LaROSE v. LaROSE
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1988 OK 117, 764 P.2d 172, 59 OBJ 2936, Ledbetter v. Oklahoma Alcoholic Beverage Laws Enforcement Com'n
Discussed
 1940 OK 217, 102 P.2d 862, 187 Okla. 373, LOEFFLER v. FEDERAL SUPPLY CO.
Discussed
 1990 OK 121, 803 P.2d 1119, 61 OBJ 3027, Texas County Irr. and Water Resources Ass'n v. Oklahoma Water Resources Bd.
Cited
 1993 OK 85, 859 P.2d 1081, 64 OBJ 2009, Kluver v. Weatherford Hosp. Authority
Discussed
 1952 OK 64, 241 P.2d 1114, 206 Okla 50, THOMAS v. OWENS
Discussed at Length
 1946 OK 113, 167 P.2d 884, 196 Okla. 633, MAGNOLIA PIPE LINE CO. v. OKLAHOMA TAX COMM'N
Discussed
 1936 OK 785, 64 P.2d 263, 178 Okla. 608, PRUITT v. PILGREEN
Discussed
 1954 OK 341, 277 P.2d 176, APPLICATIONS OF OKLAHOMA TURNPIKE AUTHORITY
Cited
 1956 OK 39, 293 P.2d 590, CITY OF DUNCAN v. BARNES
Cited
 1932 OK 637, 14 P.2d 690, 159 Okla. 119, KILGORE et al. v. STEPHENS et al.
Discussed
 1963 OK 298, 388 P.2d 300, W.S. DICKEY CLAY MFG. CO. v. FERGUSON INV. CO.
Discussed
 1967 OK 62, 434 P.2d 905, IN RE GUARDIANSHIP OF DURNELL
Discussed
 1923 OK 137, 213 P. 743, 89 Okla. 31, BRADFORD v. MAYES MERCANTILE CO.
Discussed
 1968 OK 180, 448 P.2d 851, LITTLEFIELD v. ROBERTS
Discussed
 2004 OK 38, 92 P.3d 96, MARTIN v. ARAMARK SERVICES, INC.
Discussed
 1996 OK 35, 913 P.2d 302, 67 OBJ 869, Quail Creek Golf v. Okl. Tax Comm.
Discussed
 2007 OK 19, 157 P.3d 738, HAGEN v. INDEP. SCHOOL DIST. NO. I-004
Discussed
 2007 OK 21, 158 P.3d 461, OKLAHOMA CITY ZOOLOGICAL TRUST v. STATE ex rel. PUBLIC EMPLOYEES RELATIONS BD.
Discussed
 1980 OK 112, 614 P.2d 576, Riffe Petroleum Co. v. Great Nat. Corp., Inc.
Discussed
 1979 OK 171, 604 P.2d 373, REAMS v. TULSA CABLE TELEVISION, INC.
Discussed
 1928 OK 269, 268 P. 276, 131 Okla. 249, BLACK v. FARRELL
Discussed at Length
 1928 OK 277, 268 P. 1100, 131 Okla. 282, POPP v. MUNGER
Discussed
 1982 OK 42, 643 P.2d 312, Peabody Galion Corp. v. Workman
Discussed
 1982 OK 142, 656 P.2d 258, Board of Educ., Vici Public Schools, Independent School Dist. No. I-5, Dewey County v. Morris
Cited
 1999 OK 41, 982 P.2d 1071, 70 OBJ 1551, Neer v. State ex rel. Oklahoma Tax Commission
Discussed
Title 30. Guardian and Ward
 Cite
Name
Level

 30 O.S. 1-101, Short Title
Cited
 30 O.S. 1-121, Duties of Guardian of the Property - Powers - Fiduciary Duty
Cited
 30 O.S. 4-301, Inventory and Account of Ward's Estate
Cited
 30 O.S. 4-303, Account Settlement and Allowance - Reports - Consolidation of Reports - Accounting Information
Cited
 30 O.S. 4-709, Investment of Monies Belonging to Estates - Purchase of Homesteads for Incapacitated or Partially Incapacitated
Discussed at Length
 30 O.S. 4-803, Removal or Resignation of Guardian
Discussed
 30 O.S. 4-901, Civil Liability of Guardians or Petitioners - Damages - Willful or Malicious Filing of False Petition or Application
Cited
Title 12A. Uniform Commercial Code
 Cite
Name
Level

 12A O.S. 1-201, General Definitions and Principles of Interpretation
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA